**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**CLARKSBURG**

**STACIE JO SATTERFIELD,**

                    Plaintiff**,**

**v.**                                                    **CIVIL ACTION NO.: 1:16-CV-221**
                                                         **(JUDGE KEELEY)**

**NANCY A. BERRYHILL,**
**Acting Commissioner of Social Security,**

                    Defendant.

## <u>REPORT AND RECOMMENDATION</u>

## I.      <u>INTRODUCTION</u>

On November 18, 2016, Plaintiff Stacie Jo Satterfield ("Plaintiff"), by counsel Jan Dils,

Esq., filed a Complaint in this Court to obtain judicial review of the final decision of Defendant

Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner" or

"Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. §

405(g). (Compl., ECF No. 1).   On January 25, 2017, the Commissioner, by counsel Helen

Campbell Altmeyer, Assistant United States Attorney, filed an answer and the administrative

record of the proceedings.  (Answer, ECF No. 6; Admin. R., ECF No. 7). On April 25, 2017, and

May 24, 2017, Plaintiff and the Commissioner filed their respective Motions for Summary

Judgment.  (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 15; Def.'s Mot. for Summ. J.

---

[1] After this suit was filed, but before this Report and Recommendation was entered, Nancy A. Berryhill replaced
Commissioner Carolyn W. Colvin as the Acting Commissioner of Social Security. Accordingly, pursuant to Rule
25(d), Fed. R. Civ. P., and 42 U.S.C. § 405(g), Nancy A. Berryhill is substituted for Carolyn W. Colvin.

("Def.'s Mot."), ECF No. 17).   Following review of the motions by the parties and the administrative record, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II.   PROCEDURAL HISTORY

Plaintiff initially filed an application for disability benefits on June 1, 2012 (R. 314), which was denied on September 5, 2012 (R. 141). Subsequently, on January 21, 2013, Plaintiff protectively filed an application under Title II of the Social Security Act for a period of disability and disability insurance benefits ("DIB") alleging disability that began on September 20, 2010. (R. 291).   Considering the prior denial and *res judicata* of same, the ALJ noted that Plaintiff was "willing to amend her alleged onset date" and considered Plaintiff's disability status beginning September 6, 2012. (R. 12). Plaintiff's earnings record shows that she acquired sufficient quarters of coverage to remain insured through June 30, 2015; therefore, Plaintiff must establish disability on or before this date. (R. 331).   This claim was initially denied on March 15, 2013 (R. 142) and denied again upon reconsideration on April 22, 2013 (R. 156).   On May 2, 2012, Plaintiff filed a written request for a hearing (R. 192), which was held before United States Administrative Law Judge ("ALJ") George Mills on June 1, 2015 in Morgantown, West Virginia. (R. 59).   Plaintiff, represented by counsel Yvonne Costelloe, appeared and testified, as did James Prim, an impartial vocational expert. (Id.). On July 16, 2015, the ALJ issued an unfavorable decision to Plaintiff, finding that she was not disabled within the meaning of the Social Security Act. (R. 35-58). On September 26, 2016, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. 28).

## III.   <u>BACKGROUND</u>

**A.   Personal History**

Plaintiff was born on December 21, 1977, and was thirty-seven (37) years old at the time of the hearing. (R. 44). She completed high school and one year of college coursework (R. 46). Plaintiff's prior work experience included work as a bartender, customer service representative, billing clerk, home health aide, secretary, in-home parenting counselor, security guard, retail stocker, convenience clerk, and industrial cleaner. (R. 48-57). She was divorced at the time she filed her claim and at the time of the administrative hearing. (R. 59). She has one sixteen-year old daughter who lives with her, and one eleven-year-old daughter who lives with her father. (R. 1012). Plaintiff alleges disability based on degenerative disc disease from L3 – S1 and herniated/bulging discs in her back, supraventricular tachycardia (SVT), severe sciatic nerve damage in her back and legs, benign hyper tensity syndrome affecting joints, left knee problems, depression, anxiety, panic attacks, and bipolar disorder. (R. 114-115).

**B.   Medical History**

**1.   Relevant Medical History**

On January 27, 2010, Plaintiff was seen by Dr. Cox at Mid-Ohio Valley Medical Group, at which time her low back pain was noted to have remained stable. (R. 562). Plaintiff continued to complain primarily of abdominal pain throughout 2011. In January 2012, imaging studies were ordered pursuant to Plaintiff's continued complaints of low back pain, and conducted on January 10, 2012. (R. 528). Referral to PARS was noted pursuant to "slight hyperlordosis of the lumbosacral spine [and] mild anterior spurring at L5." <u>Id.</u>

On January 23, 2012, Plaintiff again presented to Marietta Memorial ER with complaints of back pain, described as sharp and non-radiating. (R. 699). Plaintiff was given Morphine,

Norflex, and Hydromorphone and discharged with instructions to follow up with the Spine

Center the next day. (R. 700). Additional notes from Marietta Memorial Spine Center stated that:

> Dr. Khosrovi has reviewed her MRI, lumbar. She does have some minor degenerative disk disease at L4-5 and LS-S1 but no significant neural compression and the C-spine is stable on flexion and extension. He has asked that the patient do a conservative treatment trial with physical therapy and should certainly include strengthening exercises, especially in light of Dr. Brar's note about injury avoidance and strengthening. If she continues to have muscular joint pain, can certainly see physiatry to discuss injections. If she fails physical therapy and physiatry, Dr. Khosravi has asked that she get a diskogram at 4-5 and 5-1 with 3-4 to be used as controls for her lumbar complaints. Will continue to case manage the patient and make certain that she gets the results.

 (R. 691). On February 6, 2012, Plaintiff was seen by Gurpreet Brar, M.D. pursuant to

complaints of "varying degrees of musculoskeletal discomfort involving her spine, shoulders,

hips, and knees, [] consist[ing] of varying degrees of arthralgia and myalgia without any

persistent redness, heat, or swelling affecting her joints" with variable morning stiffness. (R.

452). Physical examination was largely normal, except that Plaintiff satisfied Beighton's criteria

for joint hypermobility. Id. Dr. Brar diagnosed "joint hypermobility involving the cervical spine,

shoulders and elbows, thumbs and fingers, lumbar spine and both hips." Id. On February 9, 2012,

Plaintiff was seen by Benjamin Moorehead, M.D. at WVU Department of Orthopedics for her

left hip pain, which "has been present for several months but [] significantly worse the last

month." (R. 615). Plaintiff reported that her pain was in her hip and groin, and was worse with

prolonged sitting and hip rotation. Id. Physical examination revealed full range of motion, with

paint at terminal internal rotation and external rotation; four out of five strength in the gluteus

groups, tenderness in the lateral hip, no swelling, and a normal gait. (R. 616). Dr. Moorehead

assessed left hip pain, snapping hip syndrome, and trochanteric bursitis of the left hip. Id. Dr.

Moorehead recommended physical therapy. Id.

A CT scan of Plaintiff's lumbar spine on April 13, 2012 revealed slightly decreased disc height at L4-L5, posterior disc bulge, and mild facet hypertrophy result[ing] in some stenosis of the neural foramina without interval change. (R. 684). The scan was ordered pursuant to Plaintiff reporting to the Marietta Memorial ER that day, complaining of vaginal, abdominal, and lower back pain after reporting she had fallen off a motorcycle. (R. 679). CT scans of Plaintiff's abdomen and cervical spine were unremarkable. (R. 686-88). Plaintiff was given Hydromorphone for pain and Zofran and discharged. Id.

On April 30, 2012, Plaintiff presented to PARS Pain Center complaining of low back pain, which "developed gradually [beginning] several years ago." (R. 461). Plaintiff reported the pain had been "constant," rated it eight out of ten in severity, and described the sensation as aching, stabbing, and burning. Id. She stated the pain radiated into her left leg. Id. She stated the pain was aggravated by sitting and walking, and alleviated by being in the upright position. Id. Plaintiff also reported numbness in her feet and hands. Id. She reported that Lyrica and Percocet had been effective; whereas Vicodin, physical therapy, epidural steroids, and chiropractic treatment were ineffective. Id. An MRI revealed broad-based disc protrusion at L4-5 measuring three millimeters in dimension and a small area of annular fissuring, mild facet arthropathy at L4-5, and a small left disc protrusion at L5-S1. Id. Physical examination of the lumbosacral spine revealed a positive straight leg raise test on the right, positive facet loading bilaterally, and positive 90/90 compression bilaterally. (R. 463). Range of motion, muscle strength and tone, and stability were normal. Id. Pin prick sensation testing revealed decreased sensation on the left. (R. 464). Gait and station were normal. Id. Plaintiff was assessed with low back pain, herniated nucleus pulposis at L5-S1, lumbar radiculitis, and myofascial pain. Id. A discogram under

fluoroscopy was indicated, Id., which was subsequently performed at L3-L4, L4-L5, and L5-S1 on June 7, 2012. (R. 468).

Plaintiff returned on August 29, 2012 and was seen by Dr. Khosrovi for continued complains of "pain, numbness and tingling, weakness, difficulty walking, and a difficulty with balance and coordination." (R. 477). Dr. Khosrovi noted that:

> [Plaintiff] has exhausted all conservative treatment and is convinced that she wants to proceed with surgery if there [is] even the slightest chance that she will be better. She has pain in her back and radiates into both legs worse on the left and all the way posteriorly to her ankles. She is very limited to what she can do before the pain is so severe that she has to lay down to get some relief.

(R. 478). Dr. Khosrovi reviewed imaging studies including an MRI, CT scan, and x-ray, and noted L4-5 and L5-S1 degenerative discs with left-sided small to moderate size paracentral herniations at both levels, which cause some compression of the descending L5 and S1 roots. Id. Dr. Khosrovi noted antalgic gait, standing without difficulty, and ambulation without assistance. (R. 482). Noting that Plaintiff's complaints and clinical presentation were consistent with diagnostic findings and that she had "exhausted all conservative treatment without any meaningful benefit," Dr. Khosrovi recommended that Plaintiff have a unilateral L4-L5 and L5-S1 discectomy with interbody cage placement, posterior instrumentation and fusion. Id. He cautioned Plaintiff that surgery was not guaranteed to relieve any or all of her symptoms, and on rare occasions has been found to make pain worse afterward. Id. Plaintiff did not have the recommended surgery at that time. Dr. Cox noted that Plaintiff was told she needed the surgery, and that she was requesting a second opinion from another doctor. (R. 512).

On September 29, 2012, Plaintiff presented to Marietta Memorial Hospital complaining of low back pain radiating into her groin and legs, and numbness from her buttocks down her thighs, legs, and feet. (R. 644). She described the pain as sharp and rated it ten out of ten in

intensity. Id. A physician's note indicates that she was scheduled for surgery but it was "on hold because of her insurance." Id. The attending doctor's impressions included Cauda Equina Syndrome, lumbar strain, and degenerative disc disease, for which he ordered imaging. (R. 645). A lumbar MRI subsequently showed no evidence of Cauda Equina Syndrome, but showed the same disc protrusions and findings as before, except that "enlargement of an associated annular tear" was noted. (R. 646). Plaintiff was given pain medications and, once her pain was controlled, discharged. (R. 645).

On November 8, 2012, Plaintiff was taken to Marietta Memorial Hospital after being found unresponsive. (R. 629). She was revived with Narcan and had no memory prior to waking up in the ambulance. Id. Plaintiff was "tearful and wanting to go home." Id. Urine and blood screens were presumptive positive for amphetamines, benzodiazepine, and methadone. (R. 633, 639-40).

On March 8, 2013, Plaintiff was seen at by Dr. Sanjay Bhatia, M.D. at West Virginia University Department of Neurosurgery for her back pain. (R. 601). She reported what Dr. Khosrovi had told her regarding the recommended discectomy surgery. Id. Her chief complaints at that visit included constant "left leg pain to left foot and numbness into left [big] toe on her left leg." Id. Plaintiff reported that her pain was aggravated by intercourse, trying to have bowel movements, and being on her feet. (R. 601-602). She reported that physical therapy and injections had not helped. (R. 601). She reported that there were "no relieving factors." (R. 602). Dr. Bhatia assessed [degenerative disc disease] and some disc protrusion as left L-5 subarticular foraminal region." Id. Dr. Bhatia recommended a selective nerve block (left L-5) and imaging of Plaintiff's spine, then followup. Id.

A CT scan of Plaintiff's thoracic spine conducted on May 10, 2013 was unremarkable. (R. 604). The recommended left L5 lumbar nerve block was completed that same day; afterward, Plaintiff "reported minimal relief of pain." (R. 606). Examination revealed decreased sensation in her left lower leg. (R. 601-02). She was given a transforaminal injection in the lumbar spine. (R. 605-06).

On June 16, 2013, Plaintiff returned to Marietta Memorial complaining of a headache, generalized, rated ten out of ten in intensity of pain. (R. 880). Despite that, Dr. Dinh Vu noted that Plaintiff "appear[ed] completely comfortable during [the] interview and exam." Id. The week prior, she had been seen there for reports of seizures, for which imaging studies were ordered. Id. Dr. Vu observed that the EEG was unremarkable, the CT scan of her head was normal, and that on neurology consult, Dr. Louden referred Plaintiff back to her psychiatrist for treatment of psychogenic non-epileptic seizures ("pseudoseizures"). (R. 881). ER notes emphasized that Plaintiff "has been here several different times pertaining to [the] same issue," with onset five days ago, described as moderate, non-radiating headaches that were "constant, throbbing, bilateral, frontal and occipital headaches." (R. 885). Terry Carr, D.O. noted that Plaintiff "was seen here yesterday and pain [was] better after [given a] blood patch and two milligrams of Dilaudid" (Hydromorphone). Id. Plaintiff was given more Hydromorphone and discharged. Id. An MRI of Plaintiff's brain found "scattered T2/FLAIR signal abnormality in the subcortical white matter of the left frontal [lobe]," but no other abnormalities. (R. 893).

In July 2013, Plaintiff returned to Dr. Bhatia stating she "is getting worse . . . [and] is at her witts [sic] end and wants something done." (R. 895). observed that recent imaging showed degenerative disc disease, but did not feel Plaintiff was a candidate for surgery at that time. (R. 898). On July 26, 2013, Plaintiff reported that the pain was "starting to go down the right leg

now" in addition to radiating down her left leg. (R. 807). Dr. Bhatia opined Plaintiff was "not a candidate for surgery" because the "imaging shows . . . [no] canal or formainal stenosis." (R. 808). Plaintiff reported that another physician told her that she could benefit from a fusion, so Dr. Bhatia referred her to Dr. Meile for a second opinion. Id. Dr. Bhatia wrote a prescription for Norco (acetaminophen hydrocodone). Id.

On August 26, 2013, Plaintiff was revived from an overdose at Marietta Memorial, characterized as a suicide attempt pursuant to suicidal intention. (R. 853). A urine screen was positive for methadone, opiates and benzodiazepine. Id. Todd Hawkins, M.D. performed a psychological consult following these events. (R. 857). Pursuant to a mental status examination, Hawkins stated Plaintiff was a "very depressed-appearing lady,' who was "emotionally labile, crying, yelling, almost irrational."  (R. 858). Mood was dysphoric; affect was restricted. Id. Speech was clear and thought process was coherent. Id. Hawkins noted that Plaintiff had admitted suicidal ideation the previous day, but denied it at that time. Id. Hawkins noted that Plaintiff "requires inpatient psychiatric treatment and substance abuse treatment; [although] reluctant to be admitted, [she eventually] agreed." Id. Plaintiff was subsequently sent to an inpatient Psychiatric Hospital. (R. 853). Hawkins advised that releases be sent to her psychiatrist and primary care doctor to advise against prescribing any controlled substances, as "they would certainly be contraindicated in this lady with a terrible substance abuse problem." (R. 858).

On September 20, 2013, Plaintiff was taken to Marietta Memorial ER unresponsive pursuant to overdose. (R. 819). A urine screen was positive for marijuana, amphetamine, and methadone. Id. Plaintiff was revived with Narcan. Id. On September 22, 2013, David Hill, M.D. completed a psychological consultative evaluation of Plaintiff pursuant to her most recent overdose. (R. 824). Dr. Hill noted that Plaintiff was "sent to Charleston" for five days following

her overdose, when she was "much angrier and less cooperative." Id. A mental status examination revealed Plaintiff to be alert, cooperative, and pleasant. Id. Speech was relevant, coherent, and spontaneous. Id. Plaintiff was oriented and memory was normal. Id. Diagnostic impressions included "probably polysubstance abuse, mild-to-moderate," and "bipolar disorder, depressed by history." (R. 825).

On October 15, 2013 Plaintiff presented to Dr. Cox complaining of ankle pain lasting for four days. (R. 1050). Physical examination revealed tenderness on palpation over the anterior talofibular ligament on Plaintiff's left ankle. (R. 1052).

In October 2013, Plaintiff was involved in an accident in which her vehicle rolled over. (R. 777). Imaging showed fracture of the right transverse processes of L1 to L5 vertebral bodies, right 8th and 9th rib fractures, nondisplaced fracture of the right hip, fracture of the right sacrum, and degenerative disc disease at L4-5 with desiccation with a central annular tear." (R. 781-782). (ECF No. 16 at 7). Dr. Levy noted that the transverse process fractures are "clinically insignificant and are not surgical," and that none of the findings necessitated surgery but should be treated by wearing a brace. (R. 779).

On November 3, 2013, Plaintiff reported back to the Marietta Memorial ER complaining of pain in her legs that felt like "pins and needles." (R. 806). She stated the Percocet Dr. Levy gave her was not helping, and her pain had increased in the last couple of days. Id. Imaging of Plaintiff's pelvis that day revealed "no convincing acute fracture within the pelvis." (R. 816). Plaintiff was given Hydromorphone, Valium, and Decadron and discharged. (R. 811).

Later that same day, on November 3, 2013, Plaintiff returned to WVU complaining of "increased pain, [] weakness and numbness to the [bilateral] legs, [worse on the right]." (R. 924). She reported that imaging earlier that day at a different hospital showed "increased compression

and hematoma" without bowel or bladder symptoms. Id. Plaintiff's right leg evidenced subjective decrease in sensation and reduced strength (4/5) compared to her left leg, and that imaging showed a "jumped facet." Id. Plaintiff reported pain at nine out of ten (9/10) initially, reduced to seven out of ten (7/10) after Plaintiff was given eight milligrams of morphine, five milligrams of valium, and .12 milligrams of hydromorphone. (R. 926). An MRI of Plaintiff's lumbrosacral spine showed the following:

> FINDINGS: As noted on the recent CT of the thoracic spine had demonstrated a right L1 transverse process fracture. There is corresponding bone marrow edematous changes are noted to the right transverse process of L 1. There is new levocurvature noted of the lumbar spine as a result of traumatic injury to the L5 vertebral body. [T]here is bone marrow edematous changes identified to be L5 vertebral body, with asymmetric loss of vertebral body height noted to the lateral aspect. There is also traumatic disc herniation extending to the right lateral recess and this severe right lateral recess stenosis. Edematous changes are noted to be posterior paraspinal soft tissues the conus terminates at a normal level. The cauda equina nerve roots appear unremarkable except at the L5-S1 level where they are compressed . . .
> At the L5-S1: Atraumatic right paracentral and right foraminal herniation resulting in severe right lateral recess and right foraminal stenosis with compression of the exiting nerve root. Also noted is asymmetric loss of vertebral body height along the left lateral aspect. In addition there is fractures of the posterior elements evident with suggestion of malalignment of the facets on the right (jumped facet) as noted on the axial image 35, series 10.

(R. 947-48). An MRI of Plaintiff's lumbar spine showed the following:

> Findings: There is demonstration of fracture involving the right posterior elements with evidence of a jumped facet seen best on series 9 image 63. There is fracture of the right L5 vertebral body with additional fractures noted in the bilateral L5 transverse processes. There is narrowing of the spinal canal at the L5-S1 level due to a traumatic disc herniation, right-sided jumped facet, and degenerative change. There are additional fractures noted: The right L1, L2, L3, and bilateral L4 transverse processes. Impression: Traumatic loss of height involving the inferior aspect of the L5 vertebral body asymmetrically on the left with a right-sided jumped or perched facet, traumatic disc herniation and several fractures involving the transverse processes of the lumbar spine as discussed above.

(R. 949). On November 5, 2013, Daffner performed back surgery, including an "open reduction of the facet dislocation with a hemilamenictomy and discectomy for treatment of the traumatic

11

disc herniation and radiculopathy and posterior fusion." (R. 917). He noted Plaintiff "tolerated the procedure well," and was discharged on November 9, 2013 with follow-up in two weeks. (R. 932).

At follow-up on November 22, 2013, Plaintiff reported she was "doing okay," but fell onto her buttocks earlier that morning and still had some persistent leg pain and numbness. (R. 952). She reported taking two Percocet tablets every six hours. Id. Dr. Daffner reminded her not to be lifting more than five to ten pounds, and that she should not bending or twisting excessively. Id. Dr. Daffner noted that an x-ray revealed "appropriate spinal alignment ha[d] been restored . . . [and] interval increase in L4-L5 and L5-S1 disc space loss is noted." (R. 954).

On December 9, 2013, Plaintiff returned complaining of increased weakness in her left leg, stating her left leg "gave out" on her earlier that day, since which point she has had "increasing pain and numbness in a widening distribution." (R. 954). X-rays, MRIs and CT scans revealed that "hardware is intact, alignment maintained, [there was] no new fracture, [and] no hematoma or compressive lesion." (R. 957). There was "some moderate left L5-S1 foraminal stenosis." Id. Plaintiff returned two days later to WVU reporting she had "slipped and jerked her body to the left" while out on her porch. (R. 958). Since then, she complained of "difficulty walking, with pain in her lower back, left hip into groin, and left leg numbness." Id.  Imaging showed "no spinal stenosis or abnormal mass or fluid collection in the spinal canal . . . [and] no enhancing fluid collections to suggest soft tissue abscess, [but] subtle enhancement of the left L4 nerve root . . . with inflammation." (R. 961). Plaintiff was given injections of Fentanyl and Hydromorphone. Id.

Plaintiff returned again on December 23, 2013 complaining again of frontal headache and back pain. (R. 975). She told staff that "the pain medication she is receiving is to[o] little." (R.

976). Plaintiff was kept overnight for observation:

> Pseudoseizures
> - At 2027 on 12/23 after photic stimulation patient eyes looked almost crossed eye and
> passed out. Also at 2110 patient pushed button and stated she was almost asleep and her
> heart started beating so hard she felt like it was "jumping out of her chest". Also became
> shaky and had a 3 second flattening on EKG. Don't know if it was artifact. Again at 2232
> on 12/23 patient was being helped to the restroom when she felt dizzy and lightheaded
> like she was going to pass out. Patient collapsed at bed but didn't lose consciousness.

(R. 979). She rated her pain at that visit as a five out of ten (5/10). (R. 982). Examination was

generally normal with the exception of decreased sensation in her lower left leg, and "patchy"

decreased sensation to touch and pin in her bilateral thoracic region. (R. 983). An EEG on

December 24, 2013 was normal. (R. 989).

On January 17, 2014, Plaintiff was taken to UPMC after overdosing in her home, which

was classified as a suicide attempt. (R. 1404). She did not regain consciousness until January 26,

2014 and was intubated during that time. (R. 1375). Notes from attending physicians reported

that Plaintiff had been overwhelmed by stressors:

> Pt reports that she is feeling very "pissy" today for multiple reasons. She states that she
> has not been feeling well for some time now and has noted no changes thus far after re-
> initiation of effexor. She describes how she is upset that she is on a trach that she lost
> custody of her younger daughter, and that her younger daughter's father cheated on her
> with her best friend. She reports she was also taking lamictal prior to her overdose and
> endorses that this is the second suicide attempt after her MVA this past year. She states
> she is always in pain (points to knee, back) and that no one believes her pain.

(R. 1617).

On March 6, 2014, Plaintiff was seen at Mid-Ohio Valley Medical Group by Dr. Cox to

reestablish primary care following her discharge from UPMC Hospital on February 19, 2014. (R.

10). She reported being sober for two-hundred and twenty-one (221) days, but Dr. Cox noted she

was "not working in a recovery program nor did she go to pain management that we arranged."

(R. 1036). Dr. Cox advised Plaintiff to start AA/NA meetings and get sponsorship.

On March 26, 2014 Plaintiff complained of worsening anxiety. (R. 1041). CMA Mary Bailey wrote she would "forward [the] message to Dr. Cox [to] consider increasing medication," noting that Plaintiff was "not interested in other treatments for anxiety, [and] does not want to see counselor or [be] referred." Id.

On April 9, 2014, Dr. Daffner saw Plaintiff five months post-operatively. (R. 1270). She continued to complain of low back pain, which she had prior to her surgery; ongoing left leg numbness, a "shifting" pelvis, and popping in her left hip. Id. Plaintiff claimed to not be taking any medication other than Tylenol and Motrin at that time. Id. Dr. Daffner noted that a tracheostomy scar was "new since the last time [he] saw her." Id. He noted that "when [he] asked [Plaintiff] about this, she declined to provide any further details." Id. By May 7, 2014 Plaintiff continued to report "severe pain out of proportion [] since the time of surgery." (R. 1276). Plaintiff was "in no acute distress [and] appear[ed] to be a little uncomfortable due to her pain." Id. Dr. Daffner noted he "ha[d] been unable to localize anything specific that I think is causing the pain," and noted he would check for infection and vitamin D levels. Id. He additionally noted that he was "concerned about the maturation of her fusion and the loosening around the screws, but they certainly have not pulled out at this point." Id. Dr. Daffner again told Plaintiff that "she needs to stop smoking as this can delay her bone healing." (R. 1277). He further observed that at that time Plaintiff was hyperreflexic and had a positive Hoffman's reflex, and reported changes in her handwriting, difficulty with fine motors skills, and several falls. (R. 1277). Daffner noted an MRI should be rechecked to evaluate for myelopathy. Id. Daffner noted that he did not have a good explanation for "why [Plaintiff] feels that hips are unstable when she walks." Id. He lastly noted that Plaintiff requested pain medication, which he declined as "[he] will not be prescribing her any narcotic pain medication" six months post-operatively. (R. 1277). Dr. Daffner referred

14

Plaintiff to the pain clinic at WVU for "long-term nonoperative treatment" and suggested that she keep the appointment with Dr. Gross in pain psychiatry. Id.

On November 14, 2014 Plaintiff returned to the ER with complaints of low back pain. (R. 1147). X-ray imaging showed "possible loosening of pedicle screw." Id. Plaintiff was given pain medication and told to follow up with Dr. Daffner and her primary care doctor. Id. Marietta Memorial attending staff called Dr. Daffner, "who agree[d] with outpatient [treatment] and can [followup] with patient in [his] office." Id. Imaging studies taken November 24, 2014 showed "extensive lucency surrounding the bilateral pedicle screws at L4, worrisome for hardware loosening." (R. 1149). "No definite evidence of hardware fracture was observed. Id.

On November 29, 2014, Plaintiff returned to the WVU Hospital ER with back pain, worsening in the past three weeks and getting "much worse" in the past three days. (R. 1185). Imaging studies again revealed no evidence of hardware fracture, but increase in intervertebral disc height loss between L3 and L4; "markedly increased lucency around the L4 screws bilaterally compared to May 2014 [was] concerning for hardware loosening" (R. 1189); lucency surrounding the L3 transpedicular screws suggest hardware loosening." (R. 1187). Shabnam Nourparvar, M.D. told Plaintiff that she should be admitted pursuant to blood and urine tests results that showed gram negative – i.e., antibiotic-resistant – bacteria growth. (R. 1190). Plaintiff declined admission and left against medical advice because "her ride [was] here and [she] would rather go home and follow up with ortho[pedics] in two days." (R. 1190). Plaintiff was given antibiotics and discharged. Id.

She went back to WVU Orthopedics on November 30, 2014, at which point Dr. Bravin and Dr. Daffner's notes stated that MRI "does not show any evidence of discitis, osteomyelitis, psoas or epidural abscess." (R. 1214). Accordingly, "no surgical intervention [was]

recommended at this time." Id. Orthopedics noted that Plaintiff said she "wants her screws out," but that can be managed on an outpatient basis and "there are no urgent surgical needs currently." Id.

On December 1, 2014, Dr. Daffner's interpretation of the imaging studies was "loosening of the L4 screws and lucency surrounding the L3 transpedicular screw." (R. 1224). He discussed Plaintiff's options with her, advising they could do a disc space biopsy at L3-L4 and L5-S1, a revision of the fusion, or an injection over the hardware to see if that provided relief. (R. 1225). He also advised that removal could result in the entire construct "fall[ing] apart" and any surgery would "come with a significant risk of failure." Id. Dr. Daffner advised Plaintiff that she would have to quit smoking, which she agreed with. Id.

On December 3, 2014 Plaintiff was admitted to Marietta Memorial with back pain. (R. 1065). An MRI revealed osteomyelitis and early discitis at L3-L4; Plaintiff also had bacteremia and a urinary tract infection. Id. The attending physician noted that Plaintiff's blood culture grew "strep mitis;" Plaintiff 'denied [a] history of endocarditis or [intravenous] drug use," as her past overdoses involved only pain pills. (R. 1069). These findings and conditions did not require any procedures, apart from placement of a PICC line so Plaintiff could continue antibiotic treatment after discharge. (R. 1065). Christopher Cockerham, M.D. noted that "[he] had a long discussion with [Plaintiff] about the need to make sure that she keeps [t]his PICC line clean; she is not to inject any medications or illicit drugs into her PICC line other than IV antibiotics." Id. Notes from December 4, 2013 stated that Plaintiff recently left the WVU facility against medical advice after being transferred there from Marietta Memorial ER on November 28, 2014. (R. 1067). Plaintiff continued to "decline transfer back to WVU due to the distance and want[ed] a second opinion/evaluation at MMH." (R. 1068). Dr. Levy further noted:

> The patient does not have an epidural abscess and indeed she also does have bacteremia which of course is the reason she apparently has this infectious process going on. The issue, which I did discuss with her at some length, is why what is the etiology of this infection, most commonly this is seen with immunosuppressants or IV drug abuse and she does not have either of these issues going on. At any rate, she does have this apparent infection without a clear etiology behind it

(R. 1071).

On December 7, 2014, Plaintiff reported again to Marietta Memorial with complaints of worsening lower back pain beginning the day prior. (R. 1105). She described it as gradual in onset and progressively worsening, radiating toward the right side and down her leg. (R. 1106). The pain was made worse by "any kind of movement." Id. The attending physician noted that Plaintiff "was lying in bed talking on her phone when I entered the room, [and] didn't appear to be in any significant distress [during] my evaluation." Id. He further related that:

> She has a prior history of drug overdose as well as drug abuse in the past. She is also apparently had suicidal attempts. Because of this past history pain medication is very carefully prescribed to her. This is not done by her primary care physician and she primarily gets her pain medications from her neurosurgeon that she sees Morgantown. She hasn't had a refill of the same. Doesn't want to be on pain medications and so we discussed at length about trying nonnarcotic pain medications to see the mass pain can be controlled and she is open to the idea.

Id. Imaging studies done that day revealed "[no] acute changes from previous study." (R. 1116). Plaintiff was "offered transfer[] to WVU for followup care with her orthopedic surgeon but declined, stating she would rather stay here." Id.

On December 16, 2014 Plaintiff was seen again as Marietta Memorial with complaints of pain, weakness and numbness in her lower left leg and bowel incontinence. (R. 1089). She reported having difficulty walking and using a case for the last few days. Id. She reported that her pain is improved with pain medication. Id. MRIs revealed the following:

> 1.  MRI findings are again most compatible with discitis/osteomyelitis associated with the L3/L4 level.

> There has been marginal interval expansion of the fluid collection in the disc
> space at this level.
> Otherwise, the appearance of the lumbar spine is not significantly changed
> from 12/7/2014.
>
> 2.      No evidence of epidural abscess or canal compromise.

(R. 1102). She was transferred to WVU for treatment. (R. 1096). She presented again to WVU

Orthopedics with continued complaints of low back pain as well as reports of two episodes of

bowel incontinence. (R. 1238). Plaintiff was given Percocet, Hydromorphone, and "pain-dose"

Ketamine, which were noted to have resolved her back pain, and discharged. (R. 1242). On

December 30, 2014, Dr. DiGiovine completed an intervertebral disc aspiration and sent a tissue

and fluid sample to the lab for evaluation. (R. 1264).

At followup with Dr. Daffner on January 21, 2015, he noted that Plaintiff continued to

have back pain which "seems to be getting a lot worse," and that "she appears to be quite

uncomfortable." (R. 1288). Daffner noted that Dr. DiGiovine's sample came back consistent

with Candida tropicalis. Id. In addition to continued lucencies around the L4 screws, imaging

studies also revealed "significant collapse and destruction of the disk space at L3-L4 . . .

destruction of the endplates with some retrolisthesis of L3 on L4 as well as some lateral listhesis

and asymmetric collapse." Id. Dr. Daffner admitted Plaintiff for placement of a PICC line and

antibiotic treatment and caspofungin, and referred her for an infectious diseases consult. Id. He

noted that "in all likelihood she will need surgical intervention for this given the evidence of

instability and kyphosis." Id.  Surgical plans included posterior removal of hardware, exploration

and revision of fusion L2-pelvis, then "anterior L3 and L4 debridement of discitis/osteomyelitis

and fusion." (R. 1294).

Plaintiff underwent the first stage of the procedures on January 24, 2015 including the

removal of hardware and exploration. (R. 1297). On January 27, 2015 Plaintiff underwent a

second set of procedures including L3-4 partial corpectomies, debridement and fusion. (R. 1300).

Following these surgeries, Plaintiff was "doing well, [with] pain moderately controlled [and] left

thigh numbness improving." (R. 1301). She generally continued to do well until she was deemed

ready for discharge on February 2, 2015. (R. 1318). Plaintiff was walking with assistance and

pain was controlled with medication. Id. At followup on February 9, 2015 Plaintiff was

progressing as expected and "doing well" overall. (R. 1365-66). Dr. Daffner encouraged Plaintiff

to begin to wean off narcotic pain relievers, to keep her infectious disease consult appointment,

and to stop smoking because it was important to help her bone fusion. Id. At next followup on

March 13, 2015, Plaintiff continued to do well overall and reported although she had some pain

from the operation, the pain from her discitis had "improved significantly." (R. 1367). She

reported being ready to transition to using a cane from a walker. Id.

However, on May 20, 2015, Plaintiff returned to the Marietta Memorial ER complaining

of worsening back pain over the past week. (R. 1878). She advised the attending physician that

she had fevers of 102 degrees over the weekend and her surgeon instructed her to go to the

nearest emergency department. Id. CT scan revealed the following:

> …bilateral evidence of construction failure including bilateral screw loosening at L2 and
> tight school loosening at L3 as well as fracture of right pedicle at L2. Interval placement
> of longitudinal struck graft in L3-L4 with significant bone formation about the new
> formation resultant mass effect on ventral thecal and narrowing of lateral recess at level
> of this case. Multilevel degenerative changes and lumbar spine. Peripherally enhancing
> fluid collection in posterior soft tissue presumably postoperative could represent
> infectious collection.

(R. 1886). Plaintiff was transferred to WVU from Marietta Memorial for further evaluation and

management, where she again saw Dr. Daffner on April 20, 2015. (R. 1887). Dr. Daffner

reviewed the imaging and agreed that the L2 screws did appear to have "cut out some superiorly

since the initial placement . . . their alignment has not changed, however, since her previous x-rays on March 9, 2015:"

> PLAN: Dr. Daffner discussed today with Ms. Satterfield that overall looking at her x-rays, they look good. The superior screws did appear to pull out some; however, they are stable and we do not see any motion through this area. We do not think that any particular treatment would be appropriate for her at this time. She does not really seem to be symptomatic from that anyways. She describes the pain more in the soft tissues and it does not follow any definite pattern, but rather extends down the posterior aspect of the thighs. We do want to get her in some formal physical therapy including core strengthening and conditioning, stretching of the lower extremities and they can do some modalities on the lower extremities as well. We are going to see her back in Dr. Daffner's clinic in 3 months. We will refill her Percocet but decrease the dose to Percocet 5 mg every 4-6 hours as needed for pain. She needs to understand that we will be weaning her off of this over the next month and a half or so, as we typically do not give pain medication more than 3 months after surgery. She has been on chronic narcotics for quite some time and after we have weaned her off, then we will ask that she get further prescriptions for chronic pain medications from either her primary care physician or a pain clinic.

(R. 1901-02). On April 30, 2015 Plaintiff attended her infectious disease consult appointment with Dr. Guilfoose who noted that she was "doing well overall." (R. 1907). She was taking Diflucan for her candida infection, which caused some nausea, but overall was tolerated well. Id. She reported continuing back pain and radicular symptoms averaging "7-8/10 pain most . . . days," though she "does not expect to be pain free." Id. Guilfoose noted that Plaintiff was gaining weight again; she had lost weight when the infection was active. Id. She denied fevers, and her surgical wounds were observed to have healed well. Id.

On May 21, 2015, however, Plaintiff returned to the WVU ER for low back pain radiating down both legs, bilateral leg weakness and fevers, slowly worsening over one week. (R. 1910). Dr. Daffner noted:

> I had a long discussion with her regarding her findings. No acute surgical intervention needed. We discussed the loosening of the screws and the possible development of pseudarthrosis. We also discussed the likelihood that she will need another revision procedure extending her fusion proximally. I explained to her that she absolutely must stop smoking and be tobacco/nicotine free for at least 4 weeks pre-operatively and for at

20

least 6-12 months postoperatively. In addition, her vitamin D must also be normal (between 40-60) before we can consider surgery. She expressed understanding.

(R. 1920). Imaging studied obtained that same day show that "hardware and alignment appear stable when compared with prior studies." (R. 1943).

### 2. Medical Reports/Opinions

#### a. Consultative Psychological Examination

On July 16, 2012, Amy Guthrie, M.A. and Frank Bettoli, Ph.D., completed a consultative Psychological examination consisting of a clinical interview and mental status examination. (R. 454). Guthrie summarized Plaintiff's symptoms as follows:

PRESENTING SYMPTOMS: Stacie sleeps with the aid of medication and indicates that some nights it does not help her to sleep. The anxiety often keeps her up as she has racing thoughts. She has been having crying spells on an almost daily basis for the past couple of years. Her energy level has been low for the past couple of years and she reports that it was usually high in the past. Her appetite is decreased and she has lost about 70 pounds over the last year. She describes her mood as "not great." She finds that her depression varies in intensity and duration and has lasted for a couple of months before. Stacie admits to having occasional suicidal ideation with no plans to harm herself. She does not have the history of suicide attempts. She denied any homicidal ideation.
Stacie endorses anxiety in which she worries excessively and reports that this worry does keep her awake. She finds it hard to relax and often feels emotionally drained. She does have panic attacks when she is in crowds or knows she must leave her house. She does not like to be around people she does not know and does not like people touching her in a crowd. Stacie did report a history of sexual abuse by her stepfather and states that she had not told anyone about this until recently. She has noticed that her nightmares and flashbacks have increased since telling about the abuse. She was also physically and mentally abused by her ex-husband.

(R. 455). As to the mental status evaluation, Guthrie noted Plaintiff's appearance was adequate and verbal and physical domestic abuse as an adult. (R. 458). Symptoms include nightmares and flashbacks of these events four to five times per week, avoidance of situations that remind her of the abuse, problems in relationships, anxiety around men, and feeling that she "must watch her back when out in public." Id. Guthrie believed Plaintiff's anxiety relating to being out in public

and around people is a result of the past abuse. Id. Major Depressive Disorder (recurrent, severe, without psychotic features) was also diagnosed. (R. 458). Symptoms included sleep disturbance, daily crying spells, low energy lasting for the past couple of years, decreased appetite leading her to have lost about seventy (70) pounds over the past year, and periods of depression of varying intensity lasing up to two months at a time. Id. Generalized Anxiety Disorder was diagnosed, pursuant to excessive worry that Plaintiff is unable to control, that keeps her awake, makes it hard to relax, and leaves her feeling "emotionally drained and tense." Id. Symptoms also included "becom[ing] overly anxious when [Plaintiff] thinks about leaving her home . . . she often chooses to stay home rather than go out into [the] public." Id.

Guthrie opined that Plaintiff was capable of managing her finances. (R. 458). She also opined that Plaintiff's prognosis was "guarded, due to abuse history." Id.

### b. *Disability Determination at the Initial Level*

Plaintiff was found to have the following severe medically determinable impairments: disorders of the back (discogenic and degenerative), cardiac dysrhythmia, anxiety disorder, and affective disorder (depression). (R. 119). It was determined that one or more of Plaintiff's medically determinable impairments could reasonably be expected to produce her pain or other and appropriate, her attitude was cooperative, and she was oriented times four. (R. 456). Speech was "coherent and relevant, but notably shaky." Id. Plaintiff's mood was depressed and anxious; her affect was restricted. Id. Thought processes were coherent. Id. As to perception, Guthrie observed that:

> Stacie reports periods of depersonalization in which she zones out when she is highly stressed. She also reports having flashbacks about the sexual abuse by her stepfather as well as verbal and physical abuse by her ex-husband. She finds that she avoids situations that remind her of the abuse, she has problems in relationships, she is anxious around men, and she finds herself watching her back in public.

(R. 457). Insight was mildly deficient; judgment was within normal limits. Id. Psychomotor behavior was "mildly increased, as [Plaintiff] wr[u]ng her hands and fidget[ed] throughout the evaluation." Id. Plaintiff reported occasional suicidal thoughts with no plan. Id. Immediate memory was within normal limits; recent memory was moderately deficient, and remote memory was within normal limits. Id. Concentration was mildly deficient as Plaintiff could not complete serial sevens. Id. Persistence was within normal limits; pace was "mildly slow." Id. Social functioning was mildly deficient. Id. Guthrie observed that Plaintiff was "noticeably close to tears multiple times throughout the evaluation, but would not allow herself to cry." Id. Eye contact was adequate, though she was "notably nervous." Id.

Plaintiff reported she has friends she talks to about two times a week, at her house or theirs, and she talks to her mother on the phone. (R. 457). She does not drive often but walks to her mother's or her cousin's houses. Id. She sits on her porch, watches television, and listens to music. Id. She takes her daughters to cheerleading practice. Id. Plaintiff reported that she generally does make dinner, and cleans, washes dishes, and does laundry. Id. She goes grocery shopping once a month, "but goes at odd times to avoid crowds." Id. She reported disrupted sleep, in that she is "up and down through the night." Id. Plaintiff "admit[ted] that she has sometimes gone up to two to three days without caring for her hygiene." Id.

Chronic Posttraumatic Stress Disorder was diagnosed as a result of childhood sexual abuse. (R. 120). As to Plaintiff's credibility, the disability determination first stated that Plaintiff's statements about the intensity, persistence and functionally limiting effects of symptoms were not substantiated by the objective medical evidence alone. (R. 121). On the next line, Plaintiff's statements regarding her symptoms, considering the total medical and non-

medical evidence in the file, were deemed "fully credible," with the note "Claimant's allegations are generally consistent with objective evidence." Id.

On March 14, 2013, single decision-maker (SDM) Jonathan Merrifield reviewed Plaintiff's records and completed a physical residual functional capacity ("RFC") assessment. (R. 123). Merrifield found the following exertional limitations: Plaintiff could occasionally lift and/or carry twenty (20) pounds; frequently lift and/or carry ten (10) pounds; stand, walk, and/or sit for about six (6) hours in an eight (8) hour workday; and could engage in unlimited pushing and/or pulling, within her lift/carry restrictions. (R. 121). As to postural limitations, Merrifield found that Plaintiff could occasionally climb ramps and stairs, never climb ladders, ropes, and scaffolds; and occasionally balance, stoop, kneel, crouch, and crawl. (R. 121-22). He noted that the restrictions were supported by her "[h]istory of syncope, [she] should avoid heights and hazards," and that she was "otherwise restricted by lumbar radiculitis." (R. 122). No manipulative, visual, or communicative limitations were found. Id. As to environmental limitations, Plaintiff could have unlimited exposure to extreme temperatures, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, and poor ventilations; and should avoid all exposure to hazards. Id. Merrifield ultimately opined that Plaintiff was capable of a restricted range of light work. (R. 123).

On March 15, 2013, agency reviewer Frank Roman, Ed.D. reviewed Plaintiff's records and completed Psychiatric Review Technique ("PRT") and Mental Residual Functional Capacity ('MFRC') assessments. (R. 120, 123). Roman found mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration. (R. 120). As to social interaction limitations, Roman found Plaintiff was moderately limited in her

ability to interact appropriately with the general public, and her ability to accept instructions and respond appropriately to criticism from supervisors. (R. 123). Social interaction limitations were supported by her history of depression and PTSD from past abuse; Roman noted that Plaintiff was uncomfortable in public and preferred to limit social interactions, especially after heart surgery. (R. 123-24). Ultimately, Roman opined Plaintiff was "able to follow routine 1-2 step duties in a low pressure setting with initial supervision, [could] tolerate occasional social interaction in a small setting, [and could] adapt to a basic routine and meet clear cut goals." (R. 124).

### c. *Disability Determination at the Reconsideration Level*

On reconsideration, the determination indicated no new conditions, no new physical or mental limitations, no change in existing conditions, and noted that Claimant "does not report any new evidence" since the initial determination. (R. 129). At reconsideration, the determination again stated that Plaintiff's statements about the intensity, persistence and functionally limiting effects of symptoms were *not* substantiated by the objective medical evidence alone, but also that Plaintiff's statements regarding her symptoms, considering the total medical and non-medical evidence were "fully credible" and "generally consistent with objective evidence." (R. 134).

On April 10, 2013, agency reviewer Fulvio Franyutti, M.D. reviewed the prior RFC assessment and affirmed it as written. (R. 136). On April 10, 2013, agency reviewer Ann Logan, Ph.D. reviewed the prior PRT and MFRC assessments and affirmed them as written. (R. 137).

### d. Psychiatric Evaluation

On June 3, 2017, Debra Simons completed a psychiatric evaluation of Plaintiff, including

a mental status examination, pursuant to a referral from Dr. Cox for evaluation and treatment of

bipolar disorder. (R. 624). Simons summarized the issues as follows:

> She says she has been flying off the handle. She has been having anger issues. She says she has never been one to be medicated for Bipolar Disorder, but she is having a lot of problems and lot of stress, several mood swings from one emotional extreme to another. She is having nightmares about bad childhood memories and flashbacks. Her energy is up and down with her mood. Her motivation is up and down with her mood. She feels sad. She feels hopeless, helpless and worthless. She denies any suicidal or homicidal ideations. She is irritable. Sbe has sleep changes. She says she is not even sleeping very well with her Ambien. She is only getting a couple of hours a night. Her appetite comes and goes. She is losing some weight. She has lost about 12 pounds in the past three weeks. She is restless. She has anger, anger outbursts. She has poor concentration. She says she starts multiple tasks and does not finish any. She has difficulties making decisions and that she questions everything that she does. Stacie states that she has had panic attacks and been in ER a couple of times. She has had less panic attacks since she has been on Klonopin. She says she still has about three a week. She is nervous about everything. She has the panic attacks with shortness of breath, chest tightness, feelings of impending doom. She says she gets headaches and she walks and she cries. Her moods are up and down. She has episodes of increased energy, euphoria, invincibility.
> She has racing thoughts. She says that she has decreased sleep. Sometimes, she goes three or four days without sleeping at all. She has increased talking. She is distracted. She has increased goal directed activity, which means that she gets more done when she has the energy and she has increased pleasure seeking activities. She is always doing things that she should not do whenever she is hyper. She denies any auditory or visual hallucinations, suspiciousness, paranoia or delusions.

Id. Simons noted Plaintiff's appearance was appropriate. (R. 625). Mood and affect were

"slightly anxious." Id. Thought and speech were normal. Id. Plaintiff was alert and oriented. Id.

Psychomotor activity was "slightly hyperactive." Id. Insight and judgment were fair. Id.

Perceptions were intact, although not formally tested. Id. Plaintiff reported passive thoughts of

hurting herself for about a month. Id.

Simons diagnosed Bipolar Disorder (not otherwise specified), Major Depressive Disorder

(recurrent, moderate), Insomnia, Anxiety Disorder (not otherwise specified), and Post Traumatic

Stress Disorder. (R. 625). Simons assessed a Global Assessment of Functioning (GAF) score of

50. (R. 626). Simons adjusted her medications – increasing her Klonopin for anxiety, increasing

her Zoloft for depression, increasing her Ambien for insomnia, and starting her on Lamictal as a mood stabilizer. Id. They discussed individual therapy; Plaintiff reported that "she is feeling down enough right now, but does not want to dig anything else up and deal with it, because she is afraid it will make her more down." Id. Simons opined that Plaintiff's prognosis was fair, given that "she seems to be motivated for treatment and most likely will be compliant with medications." Id.

### e. Consultative Examination

On August 13, 2014, Psychologist Martin Levin, M.A. completed a psychological evaluation consisting of a consultative interview and mental status examination. (R. 1011-1018). Levin noted that he had reviewed Guthrie's prior examination in August 2012. (R. 1011). As to the mental status examination, Levin noted Plaintiff's appearance was appropriate. (R. 1014). She was "appropriate but anxious" throughout the evaluation, and made good eye contact. Id.

Her attitude was "pleasant and cooperative, though there was a high level of anxiety." Id. Speech was normal and adequate. Id. Plaintiff was oriented to person, place, time, and circumstance. Id. Her mood was "depressed and angry;" affect was labile. Id. As to thought process, Levin noted that Plaintiff "demonstrated some flight of ideas." Id. Her thought content "indicated some obsess-compulsive symptoms and some rigidity." Id. Perceptions were negative. Id. Insight and judgment were within normal limits, though Levin observed that "when Stacie is in manic episodes, she makes poor judgments and becomes aggressive." Id. Plaintiff's psychomotor behavior was "moderately advanced." Id.  Immediate memory was within normal limits; recent memory was moderately deficient, and remote memory "seems to go up and down depending on her mood." Id.  Concentration was severely deficient based on serial seven performance. Id. Persistence is within normal limits; pace was slow. Id.

27

Levin diagnosed Bipolar Disorder, severe (most recent episode depressed) and Panic Disorder. (R. 1015). Levin based his bipolar diagnosis "on symptoms . . . in the Presenting Symptoms section [including] both manic and depressive episodes." Id.  Levin noted that "severe" was warranted due to "the number and strength of symptoms." He further opined that Plaintiff's prognosis was "poor." Id.

Levin additionally completed a Medical Source statement form on October 2, 2014 in which he opined that Plaintiff did not have significant limitations in her ability to understand, remember, and carry out instructions. (R. 1016). He found Plaintiff had moderate limitations in her ability to interact appropriately with the public, supervisors, and co-workers; as well as moderate limitations in her ability to respond appropriately to usual work situations and to changes in a routine work setting. Id. He cited to "mood swings that often become anger . . . [and] often lead to unpredictable interactions with others." Id. Levin opined that Plaintiff could not manage benefits in her own best interest. (R. 1017).

### f.   Consultative Psychological Examination

On September 22, 2014, Stephen Nutter, M.D. completed a consultative internal medicine examination of Plaintiff. (R. 1019-1033). Nutter summarized Plaintiff's complaints as follows:

> The claimant reports she was involved in motor vehicle accident in November 2013 and fractured her back [and hurt her neck] . . . She had fusion done because of this back fracture. Also, she states she had screws present in her hips because she fractured her pelvis. There is an x-ray of the lumbar spine included in the chart that shows post operative fixation from L4 to S1, bilateral iliac fixation, and some disk space narrowing at L4-L5 and L5-S1. She reports constant pain in the lower back and somewhat in the upper sacrum. It radiates down both legs and she gets numbness in the left leg. She has intermittent neck pain about four or five days a week. It radiates down both arms. It does make first two fingers of both hands go numb with it. The claimant's back pain is aggravated by bending, stooping, sitting, lifting, standing, coughing, and riding in a car. The neck pain is aggravated by turning the head and rapid motions of the head and neck . . . . The claimant reports problems with joint pain in the hands, wrists, hips, knees, ankles,

and feet, but not the shoulders or elbows. Joint pain is constant. She had knee pain all her life. She states she has "benign hyper tensity syndrome." I am not sure if maybe she meant that she has been diagnosed with benign hypermobility syndrome. She has had x-rays on both knees and MRI on both knees. She has had surgery on left knee as noted, fixation of her iliac area and the center pelvis fractured in the accident last year. She had injection on her wrists and elbows. The claimant reports walking, standing, kneeling, squatting and going up and down stairs increases the knees and hips pain. She has had problems with her knees giving out on her and does make her fall, left knee more so than the right knee. Joint pain is constant.

(R. 1023). Dr. Nutter observed that gait was normal. (R. 1024). He noted Plaintiff "appear[ed] stable at station and comfortable in the sitting position, but very mildly uncomfortable in the supine position." Id. He observed pain, tenderness, and decreased range of motion of the lumbar spine. (R. 1026). A straight leg raise test was negative. Id. Muscle strength, grip strength, and reflexes were intact. Id. Sensory testing revealed "some abnormalities in the left foot," of undetermined cause. Id. He noted that "she reports numbness and the majority of her radicular complaints [in her left leg], so it could possibly indicate some radiculopathy, but there are no other definite findings to corroborate that on exam today." Id.

As to her complaints of joint paint, Dr. Nutter observed pain and tenderness in Plaintiff's left knee and both hips, and "some tenderness" in the right knee. Id. There were range of motion abnormalities of Plaintiff's knees. Id. Complaints of numbness in her hands and a positive Tinel's test on her right wrist "could possibly indicate some carpal tunnel syndrome as [a] contributing cause." Id. Plaintiff was unable to squat because of hip and back pain. Id. Nutter found no evidence of rheumatoid arthritis or ulnar deviation. Id. Dr. Nutter's diagnostic impressions included "Chronic cervical and lumbar strain with back fracture last year and fusion of the back," and posttraumatic degenerative arthritis. Id.

Dr. Nutter opined that Plaintiff could frequently lift and carry up to ten (10) pounds, occasionally lift and carry eleven to twenty (11-20) pounds, and could never lift or carry more

than twenty pounds. (R. 1027). Although Dr. Nutter included a handwritten explanation for these limitations, it was largely illegible. Id. Dr. Nutter opined that Plaintiff could frequently reach, handle, finger, feel, push, and pull with both of her hands, and she could operate foot controls continuously with both feet. (R. 1029). Dr. Nutter opined that Plaintiff could have occasional exposure to unprotected heights and vibrations, frequent exposure to moving parts and operating a motor vehicle; and continuous exposure to humidity/wetness, dust, odors, fumes, pulmonary irritants, and extreme temperatures. (R. 1030).

Dr. Nutter opined that Plaintiff could walk without an assistance device, walk a block at a reasonable pace on rough or uneven surfaces, climb a few steps at a reasonable pace with use of a single hand rail, and travel on her own (including public transportation). (R. 1030).  He opined Plaintiff could perform activities like shopping, simple meal preparation, and care for personal hygiene. Id. He opined that Plaintiff could sort, handle, and use paper files. Id. Lastly, Dr. Nutter opined that these limitations had lasted or would last for twelve (12) consecutive months. Id.

## C.     Testimonial Evidence

At the ALJ hearing held on June 1, 2015, Plaintiff was divorced. (R. 45). She had two daughters, aged sixteen and eleven; her oldest daughter lived with her, for whom Plaintiff receives child support. Id. Plaintiff testified that she has a driver's license but limits her driving. Id. She testified that she drove about an hour to attend the hearing, because her fiancé was unable to get off work to drive her – "otherwise, [she] would not have dr[iven her]self." (R. 46). Plaintiff graduated from high school in 1996. Id. She attended one year of college, taking general classes, pursuant to her then-goal of becoming a nurse. Id. Plaintiff also obtained a Certified Nursing Assistant ("CNA") license in approximately 1998 or 1999. (R. 51). The ALJ inquired as to Plaintiff's ability to read, write, and do simple arithmetic. (R. 46). Plaintiff testified that she

was in a coma "for about a month and a half" following an overdose the year before, and she has "memory loss due to that." (R. 47).

Plaintiff testified that she briefly worked two bartending jobs in 2011, at 77 Sunset Strip and WN Enterprises of Ohio. (R. 48). Plaintiff testified that she was trying to work for her children's sake, as she was a single mother at the time, but it was "just not possible." Id. In 2010, she worked as a customer service representative for Suddenlink Cable for a few months. (R. 49). She also previously worked as a billing clerk for Schwabe and Associates, a provider of wellness and psychiatric services. (R. 50). In 2008, Plaintiff worked in collections for Camden Clark Memorial Hospital. Id. In each of these three jobs, she did not have any significant exertional demands but rather had to sit for long periods of time. Prior to that, Plaintiff worked for Marietta Care doing in-home health services, which required lifting patients. (R. 51). Plaintiff also did secretarial work and other nursing home work at Arbors at Marietta, a nursing home. (R. 53).

In 2005 and 2006, Plaintiff worked for Allegheny Energy Service as a customer service representative. (R. 54). In 2004, Plaintiff did secretarial work at an oil and gas company, Gas Search Corporation. Id. Plaintiff also had work at the Parkersburg Inn listed in 2004, the details of which she could not recall. Id. In 2002, Plaintiff worked at Pressley Ridge, a level three facility for youths with behavioral problems. (R. 55). Also in 2002, Plaintiff worked at West Virginia Youth Advocate doing in-home instruction with parents on basic living skills and parenting. Id. In 2000, Plaintiff worked for US Security as a security guard at a local power plant. (R. 56). She also worked briefly at Wal-Mart doing retail stocking. (R. 56, 57). She also worked doing industrial cleaning at Simonton Building Products. (R. 56). She also held two additional jobs involving in-home health services with Kimberly Home Healthcare in 1997, and Peterman Healthcare in 1996. (R. 57). Plaintiff worked at Go-Mart as a convenience store clerk,

where she had cashier duties and also stocked shelves and the coolers. (R. 57). Plaintiff testified

that employment was brief and ended when she hurt her back, for which she did not file a

Worker's Compensation claim. Id.

In response to the ALJ's questioning, Plaintiff testified that her back injury was "on-and-

off throughout the years," and that she did not think it was "serious" at the time. (R. 58). She

kept working with her back problems throughout that time, until she stopped working prior to a

motor vehicle accident in 2013. Id. Her back pain is primarily in her lumbar spine, and radiates

down her arms and legs as well. Id. Plaintiff reported losing feeling in her hands "all the time."

Id. After her surgical procedures, Plaintiff used a walker and a back brace. (R. 60). Eventually,

she switched to using a cane prescribed by her doctor, which she still uses sometimes. (R. 60).

Plaintiff advised that she has been told she may need "two to three more surgeries" still. Id.

Plaintiff also testified that she has had problems with her knees throughout her childhood,

pursuant to a "deformity." (R. 59). Following an injury to her left knee in December 2007 and in

2008, she had three surgeries on her left knee. Id.

Plaintiff began getting treatment for anxiety, depression, and mental health issues in

2008. (R. 59). She testified that she also has a seizure disorder that is exacerbated by her anxiety

and depression. (R. 69). She testified that she used to do a lot of customer service, was good at

working with people, and used to be a "people person." (R. 70). Now, she does not like being

around people; it makes her feel uncomfortable. Id.

As to her medications, Plaintiff takes an antibiotic for an infection in the bones in her

back. (R. 61). She takes Ambien for sleep, Lyrica for nerve damage, Klonopin for anxiety,

Lamictal for bipolar disorder and mood, and another medication for depression. Id. Plaintiff also

takes Percocet for her pain, which is prescribed by her doctor. Id. Plaintiff testified that she had

gotten addicted to narcotic pain relievers previously, but currently takes her pain medication only as prescribed, which is closely monitored by her doctor. (R. 61-62). She also attends Narcotics Anonymous meetings at least once a week. (R. 67).

Plaintiff rated her pain the day of the hearing as a ten on a scale of one to ten. (R. 62). She testified that her pain is aggravated by sitting or walking for long periods, driving, and standing. Id. She reports that she is "up and down constantly, even when [] at home, I have to get up, walk around the house for a little bit, [and] sit back down." Id. Plaintiff testified that she cannot navigate stairs, and sleeps on a pullout bed on the first floor of her home because her bedroom is on the second floor. Id. Plaintiff estimated being able to walk about twenty steps, stand for between five to ten minutes, and sit for ten to fifteen minutes before her back begins to bother her. (R. 63). She can squat, but cannot get back up. Id. As to her hands, Plaintiff reiterated that she loses some feeling in her hands, and her anxiety and medication side effects cause her hands to shake. Id. Plaintiff testified that her orthopedic doctor, Dr. Daffner, limited her to lifting nothing heavier than a gallon of milk. Id.

Plaintiff testified that she is able to bathe and dress herself and tend to personal hygiene. (R. 65). She is not really able to prepare meals; meals are prepared either by her fiance's mother or Plaintiff's mother, depending on where she is staying. Id. Plaintiff's daily activities include walking outside on her porch and sitting on the porch swing, though she can only do so for about ten to fifteen minutes before she has to get up and goes back inside. (R. 69). She also watches television, and she will "try to pick up things and straighten up things that [she] possibly can." (R. 66). She testified that she does not go grocery shopping; her mom usually goes to the grocery store for her and does her laundry as well. Id. Plaintiff testified that she has to sit in a recliner in

a reclined position, and that the most comfortable position for her to be in is "lying straight back." (R. 69). She can sit up, but usually only for ten to fifteen minutes. Id.

Plaintiff testified that she has not been able to attend her daughter's FFA banquets or her youngest daughter's cheerleading because she cannot "walk and climb the bleachers to sit at the football games." (R. 66). Her oldest daughter (who lives with her) gets herself up for school and takes the bus to and from school. (R. 65). On some nights Plaintiff will get four to six hours of sleep; recently, she has been sleeping for an hour or so and then will be up for two hours. (R. 64). She used to love to dance and compete in dance competitions, but cannot do that any more. (R. 67). She used to love being on a computer, but cannot concentrate long enough to figure out how to do "much of anything" on a computer any more. Id. Other than attending weekly NA meetings, Plaintiff has no other activities. Id.

Plaintiff's attorney asked her about the surgical advice she had received from her doctors. (R. 68). Plaintiff testified that back in April of 2012, she was having a lot of pain that radiated from her back down her legs, and Dr. Khosrovi recommended she have surgery at that time. Id. Plaintiff testified that she was hesitant to have the surgery done then because, having had many surgeries over the years, she did not feel she could put everything on hold, given that her daughters were younger and knowing how the surgery would impact her lifestyle. (R. 69).

**D.     Vocational Evidence**

Also testifying at the hearing was James Prim, a vocational expert ("VE").  VE Prim characterized Plaintiff's past work as:

> 3.     Customer Service Representative, which is sedentary skilled work with a Specific Vocational Preparation of five (5);
>
> 4.     Billing Clerk, sedentary semi-skilled worked with an SVP of four (4);

5.      Collections Clerk, sedentary skilled work with a SVP of five (5);

6.      General Office Clerk, light semi-skilled work with an SVP of five (5);

7.      Retail Clerk, light semi-skilled work with an SVP of three (3);

8.      Gate Guard, light semi-skilled work with an SVP of three (3); Bartender, light semi-skilled work with an SVP of three (3);

9.      Industrial Cleaner, medium unskilled work with an SVP of two (2);

10.     Shelter Monitor, medium unskilled work with an SVP of three (3); and

11.     Home Health Aide, semi-skilled, medium work as generally performed but heavy work as actually performed, with an SVP of four (4).

(R. 71). With regards to Plaintiff's ability to return to her prior work, VE Prim gave the following responses to the ALJ's hypothetical:

> Q     Thank you. The profile for Ms. Satterfield would be a younger individual between the ages of, well, at her alleged onset date, she was 32; she says she's currently 37, so we have a younger individual, 32 to 37, with a high school education, maybe one year of college or higher education toward nursing but no degrees and a CNA license. And we've got different dates here where we have different impairments. For example, the state of West Virginia reconsideration analysis in the record at Exhibit 3A and 5A in the year of April of 2013, which would've been way after the alleged onset date of September of '10, at the light exertional level of work.
> Light is lifting 20 pounds occasionally; 10 pounds frequently; standing and walking six to eight hours a day with normal breaks, sitting six to eight hours a day with normal breaks, never climb any ladders, ropes or scaffolding, only occasionally climb ramps and stairs or balance, stoop, kneel, crouch and crawl and avoid all hazards. There were additional limitations involving social interaction. So assume simple, unskilled work with only occasional interaction with supervisors and coworkers but no public interaction. Looking at the work that Ms. Satterfield did in the past that you classified, would an individual limited as I've just described be able to do any of the work she did in the past?
>
> A     No to past work, Your Honor.

(R. 71-72). Incorporating the above hypothetical, the ALJ then questioned VE Prim regarding Plaintiff's ability to perform other work at varying exertional but unskilled levels:

Q     All right. Thank you. Consider the sedentary exertional level of work, sedentary is
      lifting 10 pounds occasionally; less than five pounds frequently. Standing and
      walking is only two hours out of an eight-hour day; sitting is six to eight hours
      with normal breaks. Again, never climb any ladders, ropes or scaffolding; only
      occasionally climb ramps and stairs, balance, stoop, crouch, but no kneeling or
      crawling; avoid concentrated exposure to temperature extremes, vibration and
      hazards, the hazards I'm referring to are working around moving plant machinery
      or any unprotected heights. Also consider the ability to use a cane as-needed to
      ambulate, limited to simple, unskilled work. Only occasional interaction with
      supervisors and coworkers; no public interaction, in a low stress work setting, by
      that I mean no rapid production quotas or assembly line work and limited
      decision-making responsibility. Begin addressing the issue of the work that Ms.
      Satterfield did in the past, would an individual limited as I've just described be
      able to do any of the work she did in the past?

A     No, Your Honor. All of the past work performed at the sedentary duty level was
      higher than the unskilled restriction set forth in the hypothetical, so no to past
      work.

Q     In the region to be defined by you, Mr. Prim, would there be examples of jobs, if
      any that would accommodate the hypothetical that I gave you?

A     Yes, Your Honor. The first position, Your Honor, is that of an addresser clerk,
      sedentary, unskilled, SVP level two, approximately 30,000 positions nationally
      and approximately 90 in the state of West Virginia. Second position, Your Honor,
      is that of a document preparation clerk, also sedentary, also unskilled, SVP level
      two, approximately 250,000 positions nationally and approximately 500 in the
      state of West Virginia. And lastly, Your Honor, the position of a surveillance
      system monitor, sedentary, unskilled, SVP level two, approximately 25,000
      positions nationally; approximately 20 in the state of West Virginia.

Q     Do you have available the DOT codes for each of the jobs that you described?

A     I certainly do, Your Honor. The addresser clerk is DOT number 209.587-014.
      Document preparation clerk DOT number is 249.587-018. And lastly, Your
      Honor, the surveillance system monitor is DOT number 379.367-010.

(R. 73-74). Finally, the ALJ questioned VE Prim about Plaintiff's ability to work if she is

completely credible as to the severity of her condition:

Q     Mr. Prim, consider the testimony you've heard today. Assume that I find it good
      and credible and what I simply mean by that is that the testimony that Ms.
      Satterfield, her testimony and her medical evidence is consistent as to the
      residuals that she's describing and assume that I find that these residuals affect her
      ability to maintain a sufficient level of attention, concentration and pace to
      complete a full eight-hour workday five days a week for 40 hours. Assume that
      such an individual would be off-task at least a third of the eight-hour workday on
      a continuing basis daily, greater than 10 percent. And there would be
      corresponding absences, the inability to perform at least one day a week for a total

of four in a 30-day period. Based on that hypothetical, Mr. Prim, would there be any jobs that you could identify?

A    No, Your Honor, based on that rate of off-task as well as the monthly absenteeism, that individual would be unable to maintain full time work, Your Honor.

(R. 74-75). Plaintiff's attorney questioned VE Prim when provided the chance:

Q    Mr. Prim, taking a look at the Judge's third hypothetical, I just wanted to ask specifically what is the percentage of time that somebody can be off-task before it starts to erode their capacity to maintain employment?

A    It's my vocational opinion that if an individual is off-task more than 10 percent throughout the workday due to their impairments or symptoms from their impairments that they become unproductive and are unable to maintain full time work.

Q    And I understood that four absences would be excessive. What is the number of absences that are generally tolerated for unskilled work, such as that that was provided today?

A    Counsel, based on information I've reviewed from the Bureau of Labor Statistics as well as information contained in the National Human Resource Survey, typically, a first year employee is provided anywhere from eight to fourteen paid time off days to utilize throughout the calendar year. Therefore, if an individual missed more than one day per month on a regular, sustained basis, it's my vocational opinion that they usually violate monthly attendance policies employers have in place and are unable to maintain full time work.

Q    So if an individual required repeat hospitalizations that would exceed 12 to 14 days per year, let's say 14 days per year, even if they had documentation or were hospitalized, would that erode their capacity to maintain employment?

A    In my vocational opinion, yes, counsel because that eight to fourteen paid time off days encompasses vacation time and paid time off. In today's economy, employers are very reluctant to pay unpaid away from the work, so once it starts to exceed the tolerances or the limits that competitive employers have in place, that's where there's an ability to maintain full time work exists.

Q    And if an individual in addition to the limitations provided in the second hypothetical, the sedentary one additionally had difficulty with regard to handling and fingering in their dominant hand, at what point would that erode their capacity to maintain employment or being able to perform those jobs?

A    If those individual was reduced to occasional use of their upper extremity, it usually severely erodes the work opportunities at the sedentary and light duty level.

Q    And the positions that you listed, stooping was limited to occasional. All of the jobs provided for the sedentary work only required occasional stooping or less; is that correct?

A    Yes, correct. At the sedentary level, yes.

Q    And if an individual was unable to remain in a seated position and needed to stand at will, would they be able to perform these jobs?

A     Counsel, when you indicate that they need to stand at will, would that allow that individual to remain on-task or can you attach a percentage of that standing at will take them off task?

Q     Well, let me state it this way, if an individual required the ability to be able to stand upright in the workplace and by stand upright, I mean not bending or crouching over the station but standing directly straight up and being able to remain in that position, could they still be active in performing the jobs that you listed in that type of position or would that begin to count as off-task behavior?

A     Counselor, for the addresser clerk, that would be next to impossible unless the workstation accommodated to where an individual was using an elevated desk where they can type directly in front of them. Surveillance system monitor could be performed at standing. The document preparation could also be performed at but would also involve periods of sitting for both the surveillance system monitor and documentation work.

Q     What does a document prepper do while they're standing straight up?

A     Counsel, that would either be taking files that are being scanned. They could also be standing while they are scanning information. So there is a period of time where that individual could do that. However, again, while they're going through files or they're going through documents, primarily, they're seated in front of a computer screen.

Q     So it wouldn't necessary be at-will, but there may be some opportunities during the day to do so?

A     That is correct, counsel.

Q     And if an individual in sedentary positions required the opportunity to walk away from the work station and that was more than 10 percent of the day, then that would be off-task, correct?

A     That is correct.

(R. 75-79).

## E.    Report Forms

On a Personal Pain Questionnaire form dated June 17, 2012, Plaintiff reported having back pain five to six days per week, lasting all day. (R. 346). Plaintiff described her back pain as aching, burning, and stinging. Id. Her back pain makes it hard to get out of bed, noting "It takes me a while to get moving." Id. She stated her back pain was exacerbated by bending, lifting, and twisting. Id. It is relieved "some days [by] pain medications; other times [by] ice and heat." Id. Her pain medications include Lyrica, Vicodin, and Flexeril, all of which relieved her pain "sometimes." (R. 347).

Plaintiff reported having left knee pain two to three times per week, lasting from several hours to all day long. Id. Plaintiff described her knee pain as aching and throbbing. Id. Plaintiff reported that her knee pain was "sever[ely] extreme at times." (R. 348). Her knee pain is exacerbated by steps, walking for long distances, or being on her feet for long periods of time. Id. Her knee pain is relieved by avoiding steps and not standing for long periods of time. Id. Vicodin sometimes helps relieve it. Id.

Plaintiff reported having left hip pain five to six times per week, lasting "all day, associated with back pain." (R. 349). She rated her hip pain as "extreme" and described is as an aching and grinding sensation. Id. She reported it was caused by a tear in her "L4-L5 disk [] leaking chemicals in[to her] body that is attacking nerves." Id.  She stated that medication sometimes helped, the same with her other pains. Id.

Plaintiff reported that her chest pain feels like her "heart is skipping beats [and] pounding fast," causing her to pass out. (R. 359). She stated it starts in her shoulder and goes down her arm. Id.  She stated it is brought on by stress, anxiety, and feeling overwhelmed. Id. She takes Toprol XL to "help control [her] heart." Id.

A disability report form (field office) dated February 5, 2013 noted that "NH denied after this date but was not represented and alleged a mental health issue. [T]herefore *res judicata* does not apply and [potential onset date] is [alleged onset date]." (R. 360).

**F.    Lifestyle Evidence**

On an adult function report dated June 20, 2012, Plaintiff reported that her back pain makes it hard for her to sit for long periods of time, while her knee pain makes it hard to be mobile. (R. 351). She stated she cannot be in public places for very long due to her anxiety and depression. Id. She reported that after taking her medications, it usually takes her about thirty

minutes to an hour to "get [her] body moving." (R. 352). Her daily activities at that time consisted of taking her daughter to her activities, doing housework, and making dinner. Id. Plaintiff reported that her daughters took care of their dog and helped her with housework. Id. She reported that she could feed, dress, and bathe herself, but washing her hair caused a lot of back pain and takes longer to get done, and she has to sit down to shave. Id.  Plaintiff stated that "when [she] get[s] down with depression, [she] will go several days [without] bathing." (R. 353). She reported needing to put her medications in a weekly pill box separated by morning, noon, and night; otherwise, she could not keep them straight. Id.

Plaintiff reported preparing simple foods like sandwiches, chips, and "easy stuff." (R. 353). She used to be "very passionate about cooking, [but] now [she] could care less." Id. She reported being able to do dishes and laundry, with the help of her daughters. Id. It takes her about thirty minutes, because she has to take breaks in between. Id. She reported not being able to do yard work at all. (R. 354). Although Plaintiff was capable of going out alone, how often she goes outside "depends on the day." Id. Plaintiff stated that she panics around people and that "bothers her anxiety." Id. She went grocery shopping once a week, stating "I get what I need and get out." Id. She reported being able to pay bills, but not being good at managing money. (R. 354-55).

As to hobbies and interests, Plaintiff listed only that she sometimes watches television "off and on daily." (R. 355). The only people she reported spending time with were her children, going to school and sports activities with them a few days a week. Id. She reported that she "tr[ies] to do as much as possible with my children, but some days [she is] not able to go". Id. She reported that her depression made her not want to go anywhere or do anything. Id. Since this began, she reported that she had "excluded [her]self from almost everyone." (R. 356).

Plaintiff stated that her conditions affect her ability to lift, squat, bend, stand, walk, sit, kneel, climb stairs, concentrate, remember things, complete tasks, and get along with others. (R. 356). She stated she was able to walk about two hundred (200) feet before needing to rest for a few minutes. Id. She reported following written and spoken instructions "good." Id. Plaintiff stated she got along with authority figures "Ok[ay] to a certain extent." (R. 357). When asked if she had never been fired or laid off from a job because of problems getting along with others, Plaintiff had checked both "Yes" and "No," and then marked out both. Id. Plaintiff stated she does not handle stress or changes in her routine well at all. Id. When asked if she had noticed any unusual behaviors or fears, Plaintiff had checked both "Yes" and "No," and then marked out both. Id.

On February 25, 2013, the date of the next adult function report form, Plaintiff reported that her back problems made it difficult to do any lifting. (R. 363). Her heart conditions (SVT) caused her to pass out at times. Id. She was unable to climb steps or be on her feet for very long due to her knee surgeries. Id. On the other hand, her back injuries made it difficult to sit or stand for very long. Id. As a result, she is "constantly sitting and standing and sitting and standing." Id. She could do laundry and dishes, but could no longer sweep, mop, or vacuum as it caused her back to hurt "extremely bad." Id. As a result, Plaintiff's daughter completed those tasks. Id. Plaintiff stated that her daughters, who were fourteen and nineteen at the time, "do more for [her] than [she] does for them." Id.

In addition to her previous reports, Plaintiff stated it was now "extremely hard" to fall asleep because of numbness and tingling in her arms and legs. (R. 364). She reported having to sit down while getting dressed so she does not lose her balance. Id. She now went grocery shopping once a month, with her daughters helping her. (R. 367). She reported leaving her house

three times a week, to a friend's house or to a restaurant. Id.  She reiterated that she would

"rather be alone." (R. 368). She stated she could walk about half a block before needing to rest

for five minutes. Id. She could pay attention for long period, finishes what she starts, and follows

written and spoken instructions "well." Id. She still did not handle stress or changes in routine

well. (R. 369).

On a disability report form dated April 30, 2013, Plaintiff reported that her pain had

increased, and she was feeling more depressed and anxious. (R. 380). On a form titled

"Claimant's Medications," Plaintiff reported taking the following: Diflucan for bone infection,

Ambien for insomnia, Vanlafaxine HCL and Abilify for depression, Lyrica for nerve damage,

Percocet for pain, Klonopin for anxiety, and Lamictal for mood disorder (bipolar). (R. 407).

## IV.    THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or
mental impairment or impairments are of such severity that he is not only unable
to do his previous work but cannot, considering his age, education, and work
experience, engage in any other kind of substantial gainful work which exists in
the national economy, regardless of whether such work exists in the immediate
area in which he lives, or whether a specific job vacancy exists for him, or
whether he would be hired if he applied for work…'[W]ork which exists in the
national economy' means work which exists in significant numbers either in the
region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-

step sequential evaluation process to determine if a claimant is disabled:

(i) At the first step, we consider your work activity, if any. If you are doing
substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If
you do not have a severe medically determinable physical or mental impairment
that meets the duration requirement . . . or a combination of impairments that is
severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . ." 20 C.F.R. §§ 404.1520; 416.920 (2011).]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520; 416.920 (2011). If the claimant is determined to be disabled or not disabled at one of the five steps, the process does not proceed to the next step. Id.

## V.   ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

1.   The claimant meets the nondisability requirements for a Period of Disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act so as to be insured for such benefits only through June 30, 2015.

2.   The claimant did not engage in any apparent "substantial gainful activity" from September 6, 2012, through June 30, 2015, i.e., during the relevant period that is initially at issue herein (20 CFR §§ 404.1520(b) and 404.1571 et seq.).

3.   From September 6, 2012, through June 30, 2015, the claimant evidenced the following "severe" medically determinable impairments that significantly limited her ability to perform basic work activities for a period of at least 12 consecutive months: residual effects, status post October 2013 eighth/ninth rib fractures and thoracolumbosacral fractures involving right transverse process from T12-L5, and LS inferior endplate, and November 2013 lumbar fusion; degenerative disc disease of the lumbar spine at L4-5; history of knee surgery x3; bipolar/major depressive

43

disorder(s); generalized anxiety/posttraumatic stress disorder(s); and history of polysubstance abuse/dependence (including "social" alcohol consumption in conjunction with use of prescribed, controlled substances, "every day" cannabis abuse and recurrent opiate abuse) (20 CFR § 404.1520(c)).

4.  From September 6, 2012, through June 30, 2015, the claimant had no medically determinable impairments, whether considered individually or in combination, that presented symptoms sufficient to meet or medically equal the severity criteria for any impairment listed in Appendix 1, Subpart P, Regulation No. 4 (20 CFR §§ 404.1520(d), 404.1525 and 404.1526).

5.  From September 6, 2012, through Jm1e 30, 2015, the claimant had the residual functional capacity to perform a range of work activity that: requires no more than a "sedentary" level of physical exertion; accommodates use of a cane to assist with ambulation; requires no crawling, no kneeling, no climbing of ladders, ropes or scaffolds, and no more than occasional balancing, climbing of ramps or stairs, crouching or stooping); entails no concentrated exposure to temperature extremes, vibration or hazards of moving plant machinery and unprotected heights; limited to simple, unskilled tasks; requires no public contact or more than occasional interaction with coworkers/supervisors; imposes no rapid production quotas/involves no assembly line duties; and involves limited decision making responsibility (20 CFR §§ 404.1520(e) and 404.1567(a)).

6.  From September 6, 2012, through June 30, 2015, the claimant lacked the ability to fully perform the requirements of any "vocationally relevant" past work (20 CFR § 404.1565).

7.  During the initially relevant period from September 6, 2012, through June 30, 2015, the claimant is considered for decisional purposes as a "younger individual age 18-44" (20 CFR § 404.1563).

8.  The claimant has attained more than a "high school" education and is able to communicate in English (20 CFR 404.1564).

9.  This case presents no material issues with regard to the potential transferability of any previously acquired job skills (see Social Security Ruling 82-41, 20 CFR § 404.1568 and Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and prescribed residual functional capacity, she remained capable from September 6, 2012, through June 30, 2015, of performing jobs that exist in significant numbers in the national economy (20 CFR §§ 404.1560(c) and 404.1566).

11.     The claimant was not under a "disability," as defined in the Social Security Act, at any time from September 6, 2012, through the June 30, 2015, date upon which she was last insured for a Period of Disability and Disability Insurance Benefits) (20 CFR § 404.1520(g)).

(R. 11-25).

## VI.      DISCUSSION

### A.      Standard of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). However, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment…if the decision is supported by substantial evidence." Hays, 907 F.2d at 1456 (citing Laws, 368 F.2d at 642; Snyder v. Ribicoff, 307 F.2d 518, 529 (4th Cir. 1962)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### B.       Contention of the Parties

Plaintiff, in her Motion for Summary Judgment, asserts that the Commissioner's decision "is contrary to the law and is not supported by substantial evidence when the record as a whole is reviewed by this Court." (Pl.'s Mot. at 1, ECF No. 15). Specifically, Plaintiff alleges that the ALJ "failed to properly consider the totality of the evidence and instead was fixated on a false predisposition that Satterfield's medical treatment and presentations were secondary to drug seeking behavior. In doing so, the ALJ misstated, misunderstood, or misconstrued the medical evidence and findings to support this false predisposition, and as such, the decision was not based on the substantial evidence of record." (Pl.'s Br. in Supp. of Mot. for Summ. J. ("Pl.'s Br.") at 13, ECF No. 16.) Plaintiff asks the Court to reverse and remand the ALJ's decision denying benefits for further consideration. Id.

Defendant, in her Motion for Summary Judgment, asserts that the decision is "supported by substantial evidence and should be affirmed as a matter of law." (Def.'s Mot. at 1, ECF No. 17). Specifically, Defendant alleges that Plaintiff's drug-seeking behavior was "by no means the only reason that the ALJ found her complaints not consistent with the evidence, or for finding Plaintiff capable of sedentary work." (Def.'s Br. in Supp. Of Def.'s Mot. for Summ. J. ("Def.'s Br.") at 12, n. 4, ECF No. 18). Rather, Defendant argues, there were numerous reasons for same, and the ALJ committed no error in so finding. Id.

### C.  Analysis[2] of the Administrative Law Judge's Decision

In the undersigned's view, the primary issue in this case is best framed as whether an ALJ's perception of "drug-seeking behavior" can properly support a finding of incredibility as to

---

[2] As to scope, the undersigned notes that it is Plaintiff's physical impairments that are at issue – primarily her back issues, and to a related extent, associated pelvis, knee, and leg issues. Accordingly, discussion is limited largely to Plaintiff's medical records as to those physical impairments, although mental health records do contain some information that is discussed when relevant to credibility, and mental health opinions are included.

pain when there are medically documented independent bases to support the allegations. The undersigned does not think that it can. And even if it could, an ALJ's assumption of drug-seeking behavior does not excuse the ALJ from his duty to analyze the relevant factors as directed, and fairly consider the claims in light of the record as a whole. For these reasons, because there are a number of other related shortcoming with the ALJ's findings, and given the complexity of the record, the undersigned feels this case is properly remanded for reconsideration.

### 1. **Plaintiff's Credibility**

The determination of whether a person is disabled by pain or other symptoms is a two-step process. Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996); see also 20 C.F.R. § 404.1529(c)(1); SSR 96-7p, 1996 WL 374186 (Jul. 2, 1996). First, the ALJ must expressly consider whether the claimant has demonstrated by objective medical evidence an impairment[3] capable of causing the degree and type of pain alleged. Craig, 76 F.3d at 594. Second, once this threshold determination has been made, the ALJ considers the credibility of the subjective allegations in light of the entire record. Id.

A reviewing court is tasked with determining whether substantial evidence supports a disability determination, and whether the correct law was applied. 42 U.S.C. § 405(g). Generally, an ALJ's observations concerning the claimant's credibility are given great weight. Shively v. Heckler, 739 F.2d 987, 989–90 (4th Cir. 1984). "We will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" Sencindiver v. Astrue, No. 3:08cv178, 2010 WL 446174, at *33 (N.D. W. Va. Feb. 3, 2010) (quoting Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000)).

---

[3] Step one is fulfilled here. The ALJ in his decision stated that Plaintiff "has had medically determinable impairments during the period at issue that could reasonably be expected to produce some of the symptoms she has alleged. . ." (R. 22). Thus, the Court addresses only Step Two.

Deference to an ALJ's credibility determination, however, is not absolute. "We do not reflexively rubber-stamp an ALJ's findings." <u>Lewis v. Berryhill,</u> 858 F.3d 858, *870 (4th Cir. 2017). At minimum, an ALJ must have met his basic duty of explanation sufficient to permit meaningful judicial review. <u>Poling v. Berryhill</u>, Civil Action No. 2:16-CV-22, 2017 WL 2676541, *18 (N.D.W.Va. Jun. 6, 2017) ("[An ALJ's] credibility determination that fails to meet the basic duty of explanation can – and should – be reversed."). An ALJ's credibility determination must further conform with the directives in the Commissioner's Regulations, which are binding upon the Commissioner. 20 C.F.R. § 402.35(b)(1). While "[i]t is not this Court's province to second-guess the ALJ's credibility determination, it is its job to ensure that the ALJ grounded his findings on the record, and not an 'intangible or intuitive notion about an individual's credibility.'" <u>Forquer v. Colvin,</u> Civil Action No. 1:15-CV-57, 2016 WL 425064, *10, 232 (N.D.W.Va. Aug. 11, 2016) (internal citations omitted).

As to the process itself, a plaintiff's subjective statements about the intensity, persistence, or pace of her symptoms need not be corroborated by objective medical evidence to be accepted. <u>Hines v. Barnhart,</u> 453 F.3d 559, 565 (4th Cir. 2006) ("Having met his threshold obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed, [the claimant] was entitled to rely exclusively on subjective evidence to prove the second part of the test." (footnote omitted)). Indeed, 20 CFR § 404.1529 directs the ALJ to take a claimant's subjective statements into account *unless* they *cannot* reasonably be accepted as consistent with the objective medical and other evidence.[4]

---

[4] (3) Consideration of other evidence. **Since symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms.** The information that you, your treating or nontreating source, or other persons provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living) is also an important indicator of the intensity and persistence of your symptoms. **Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations**

Ultimately, "[s]ubjective symptom evaluation is not an examination of an individual's character."[5] Rather, in addition to medical evidence and a Plaintiff's statements, the factors to be considered are:

1. Daily activities;
2. The location, duration, frequency, and intensity of pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;
6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p.

> **a. The ALJ's clear focus on Plaintiff's drug use and intuitive notions of Plaintiff's character, while failing to properly address a significant amount of conflicting and relevant evidence, is legally insufficient.**

Plaintiff argues that the "ALJ's assessment of [her] medical conditions was clouded by a presumption of drug addiction and abuse," emphasizing that the ALJ devoted approximately four pages to "mischaracteriz[ing] Plaintiff's presentation and inpatient hospitalizations as drug seeking behavior. . .'" (ECF No. 16 at 4). The undersigned is compelled to agree. Comparison of the ALJ's decision and this record reveals that the ALJ's focus on Plaintiff's drug use overshadowed and replaced what should have been an analysis of these factors in accordance with the regulations. Examples of this are numerous throughout the ALJ's decision.[6]

---

and restrictions which you, your treating or nontreating source, or other persons report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account as explained in paragraph (c)(4) of this section in reaching a conclusion as to whether you are disabled. (emphasis added).

[5] Federal Register Vol. 81, No. 51, page 14166, subsequently corrected by Federal Register Vol. 81, No. 57, page 15776; also published on SSA website, https://www.ssa.gov/OP_Home/rulings/di/01/SSR2016-03-di01.html.

[6] Although not explicitly raised by Plaintiff here, one such example is apparent in the ALJ's consideration of listings. The ALJ began his discussion by stating, in relevant part, that he had "appropriately evaluated medical and

other evidence pertaining to the claimant's medically determinable impairments in conjunction with all relevant severity criteria contained within the 1.00 Musculoskeletal System (including listing . . . 1.03 Reconstructive Surgery or surgical arthrodesis of a major weight-bearing joint and 1.04 Disorders of the spine). (R. 21). In the next paragraph, the ALJ discussed how the evidence did not satisfy the listings criteria specifically for other impairments. His discussion of the listings with regard to Plaintiff's alleged back conditions, however, consisted of the following:

> As indicated above, the claimant was complaining of extreme back pain in June 2012, well prior to sustaining back fractures in an October 2013 motor vehicle accident. She reports use of addictive benzodiazepine medication since at 2009 and indicated in June 2012 that she had been using narcotics off and on. She has denied any history of substance abuse whereas other evidence indicates her to have a significant history thereof. She admits to occasional alcohol use despite being prescribed multiple medications and has continued to abuse tobacco against medical advice. She also reported daily marijuana use in January 2015. She filed both of her disability applications prior to her October 2013 accident but has since attributed significant residual symptoms to that event. However, at evaluations in August and September 2014 she was noted to do chores and housework, attend appointments, ambulate with a normal gait, and to engage in activities such as attending her daughter's school events, preparing meals and watching television. She developed discitis late in 2014 but has evidenced no intractable, listing-level pathology.

Id. In lieu of an analysis of the criteria of the relevant listings and an explanation as to why Plaintiff did not meet them, the ALJ instead opted to review evidence he felt detracted from Plaintiff's credibility as to the severity of her pain and symptoms, including her drug use. Only the last sentence vaguely addresses the listings, with regard to only *one* of the conditions Plaintiff alleged affected her back (discitis) – a condition that did not even develop until after Plaintiff's first back surgery, which she had to correct other conditions not addressed. This is problematic because the evidence of record contains significantly more information relevant to the listings cited by the ALJ that was never discussed. For example, Listing 1.00(K) explains that:

> K. Disorders of the spine, listed in 1.04, result in limitations because of distortion of the bony and ligamentous architecture of the spine and associated impingement on nerve roots (including the cauda equina) or spinal cord. Such impingement on nerve tissue may result from a herniated nucleus pulposus, spinal stenosis, arachnoiditis, or other miscellaneous conditions.
> 1. Herniated nucleus pulposus is a disorder frequently associated with the impingement of a nerve root. Nerve root compression results in a specific neuro-anatomic distribution of symptoms and signs depending upon the nerve root(s) compromised. 20 C.F.R. § 404, Subpt. P, App. 1.

Listing 1.04 elaborates:

> 1.04   Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.
> With:
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)

20 C.F.R. § 404, Subpt. P, App. 1., Listing 1.04.

The undersigned observes that there is ample evidence in this record as to Plaintiff's herniated nucleus pulposus (abbreviated throughout the record as "HNP"), spinal stenosis, and degenerative disc disease. These were not mentioned by the ALJ in explaining his listing analysis; only a discussion about drug use and a cursory statement about discitis. See, for just some examples, (R. 684) (noting on April 13, 2012 "[a]t L4-L5, slightly decreased disc height, posterior disc bulge and mild facet hypertrophy result in some stenosis of the neural foramina without interval change" on a CT scan of the lumbar spine); (R. 653) (Lumbar spine MRI on September 29, 2012 shows a small broad based disc bulge at L4-5, moderate bilateral degenerative facet arthropathy; at L5-S1, a small left subarticular foraminal disc protrusion, associated annular tear mild left subarticular and foraminal stenosis); (R. 781) ("there is a small amount of **intraepinal hemorrhage at the L5-S1 level resulting in moderate central stenosis**"). These records were prior to Dr. Franyutti's April 2013 review. Records that postdated Franyutti's review and findings include: (R. 915) (Plaintiff's treating specialist noted on November 4, 2013 that an "MRI of [lumbosacral plexus] concerning for right L5-S1 facet dislocation with **large foraminal [herniated nucleus pulposus] causing severe stenosis**") (R. 902) (assessing on November 9, 2013 bilateral lower extremity **weakness and pain, L5-S1 facet dislocation, and large L5-S1 HNP pursuant** to lumbar and thoracic MRI); (R. 947) (MRI of the lumbosacral

While the ALJ did briefly mention daily activities, factors two through six are largely glossed over in favor of intuitive notions about Plaintiff's motivation to work and drug use. This record contains ample evidence to substantiate a discussion about these factors, which the ALJ did not do because he had concluded Plaintiff was merely drug-seeking, malingering, and unmotivated to work. The record contains a vast amount of information as to her medications; as to other treatment, Plaintiff had back surgery – albeit delayed – after Dr. Khosrovi observed that Plaintiff had "exhausted all conservative treatment without meaningful benefit."   (R. 480). Plaintiff obtained a second opinion from other physicians. Dr. Bhatia opined in July 2013 that she was "not a candidate for surgery." (R. 898). However, by November 2013 Dr. Daffner opined, consistent with the first opinion, that she was: "Based on her clinical and radiographic findings, I recommended surgical treatment, specifically an open reduction of the facet

---

spine revealed **traumatic disc herniation, severe right lateral recess stenosis,** and **compression of the cauda equina nerve roots** at the L5-S1 level); (R. 957) (noting on December 9, 2013 "moderate left L5-S1 foraminal stenosis") (R. 1272) (noting on April 9, 2014 "L4-L5 has **decreased T2 signal intensity in nucleus pulposus** from degenerative loss of hydration. Localized displacement of disc in midline and left central zone is unchanged with **some hyperintense signal in posterior annulus representing degenerative fissure formation**). And although Dr. Nutter does not indicate reviewing any of Plaintiffs medical records in completion of his consultative examination in September 2014, the following records post-date his findings: (R. 1087) (noting as of December 3, 2014 "**severe degenerative disc disease[at L5-S1] is stable**); (R. 464) (assessing **LS-51 HNP**); (R. 995) (noting "**chronic [lower left extremity] L5-S1 distribution sensory deficits")**; (R. 1025) (back pain when standing on the right leg; pain with range of motion testing of the lumbar spine) (R. 1128) (November 28, 2014 present on [back] exam: vertebral tenderness (lumbar), **decreased range of motion, muscle spasm, leg pain with straight leg raise (right)**); (R. 1092) (On December 16, 2014, physical examination of back revealed **decreased range of motion, muscle spasm, leg pain with straight leg raise**; neurological exam revealed **sensory deficit – decreased sensation in lower left leg** compared to right). Although not all straight leg raising tests were positive, a number of them were. (R. 463, 472, 700, 807, 922, 1655). On some occasions, "leg pain with straight leg raise" was also noted. (R. 1076, 1092, 1128) (all emphases added).

This is but one notable example of the ALJ's failure to properly consider the evidence or a satisfactory explanation of how he reached his decision. See Radford v. Astrue, Civil Action No. 5:11-CV- 347, 2012 WL 3594642, *3 (E.D.N.C. Aug. 20, 2012) vacated on other grounds in Radford v. Colvin, 734 F.3d 288 (4th Cir. 2013). (In light of the record evidence as a whole, ALJ's conclusion was not supported by substantial evidence when ALJ provided no reasoning for finding claimant did not meet Listing 1.04, claimant's severe pain was well-documented, and the record demonstrated "disc degeneration at L4–L5 and L5–S1 as well as congenitally short pedicles which predispose him toward more severe symptoms," degenerative disk disease at L4–5 with posterior bulge and protrusion with mild to moderate spinal canal narrowing, degenerative disc disease at L5–S1, motor loss and sensory loss, and several positive straight-leg raising tests.).

Other examples of note include that the ALJ also references Plaintiff's "use of addictive benzodiazepine medication," apparently without appreciation for the fact that Plaintiff was prescribed this medication to treat her anxiety.

dislocation with a hemilaminectomy and diskectomy for treatment of the traumatic disk herniation and radiculopathy and posterior fusion." (R. 917). There is an abundance of evidence as to the details and characteristics of her alleged pain (including the location, frequency, etc.) and that she has to frequently adjust positions and recline. (R. 69). This is the sort of discussion and analysis that should have occurred in accordance with SSR 96-7p, but did not. Rather, the ALJ's primary focus was on "other factors" and intuitive notions about Plaintiff's character, and he "failed to consider evidence that contradicted his opinion on credibility." Forquer at *11. This is insufficient.

Indeed, Defendant does not directly defend the ALJ's treatment of Plaintiff's drug use, but focuses rather on inconsistencies, (ECF No. 18 at 10), and points to the other reasons the ALJ found Plaintiff to be less credible. (ECF No. 18 at 12) (arguing that although Plaintiff "focuses primarily on the ALJ's discussion of her drug-seeking behavior, [] this was by no means the only reason that the ALJ found [] her complaints not consistent with the evidence, or finding Plaintiff capable of sedentary work."). Even if Defendant had, the undersigned would find it problematic for a few reasons.

First, while Plaintiff does not dispute her history of drug use, the undersigned fails to see – and neither the ALJ nor the Defendant satisfactorily explain - how her drug use is inconsistent with her claims of pain. In fact, the record contains evidence that Plaintiff's illicit drug use is an attempt to *alleviate* the pain she alleged. See, e.g., (R. 824) (noting following Plaintiff's overdose that "she denies taking methadone every day . . . she just takes it every so often for her back pain.").[7] "Persistent attempts to obtain relief of symptoms . . . may be a strong indication that the

---

[7] In addition, one of Plaintiff's overdoses was determined to be a suicide attempt by UPMC personnel; a second overdose was suspected of same by Marietta Memorial staff, though Plaintiff later denied it. There are thus at least two reasons documented in the record for Plaintiff's illicit drug use that 1) are consistent with her allegations of pain and/or mental conditions, and 2) contradict the ALJ's claim that she was manufacturing claims of pain for the

symptoms are a source of distress and generally lend support to an individual's allegations of intense and persistent symptoms." SSR 96-7p. More importantly, strong narcotic pain relievers were regularly prescribed and administered to Plaintiff by the various medical providers she saw.

### i. Medications

The medication a claimant takes is evidence relevant to a credibility determination regarding allegations of pain. Lewis v. Berryhill, 858 F.3d 858, *869 (4th Cir. 2017) ("Lewis' [] medical conditions require her to take powerful analgesics, including Fentanyl and Oxycodone"); see also Poling v. Berryhill, Civil Action No. 2:16-CV-22, 2017 WL 2676541 (N.D.W.V. Jun. 6, 2017) adopted without objection in 2017 WL 2682073 (Plaintiff's prescriptions for narcotic pain relievers intended to treat moderate to severe pain, including Hydrocodone, Oxycodone, and Nucynta, supported subjective complaints of pain). cf. Kearse v. Massanari, 73 Fed. Appx. 601 at *603 (taking only over-the-counter medications such as Tylenol and Motrin supported finding that pain was not as severe as claimant alleged). Here, the record shows Plaintiff was regularly and repeatedly – and up through May 2015 – given Hydromorphone (R. 647, 677, 699, 743, 749, 806, 811, 889, 1076, 1199, 1932), Oxycodone (R. 926, 964, 987, 1058, 1311, 1314, 1917, 1928),

---

purpose of obtaining drugs purely for recreational use, or to have a good time. But the ALJ discussed neither of these, and merely concluded without consideration or weighing of contradictory evidence that drug use undermined her credibility.

The undersigned also observes that the mental opinions of the state agency examiners on which the ALJ relied (R. 22) were rendered in March and April 2013. They were rendered *prior* to these apparent suicide attempts by overdose, which provides additional grounds for concern about the bases of mental limitations relied on by the ALJ. On August 26, 2013, Plaintiff was revived from an overdose at Marietta Memorial, characterized as a suicide attempt pursuant to suicidal intention. (R. 857) ("She denies any of this was a suicide attempt. However, documentation in the chart states otherwise."). On January 17, 2014, Plaintiff was taken to UPMC after overdosing in her home, which was classified as a suicide attempt. (R. 1404). Notes from attending physicians reported that Plaintiff had been overwhelmed by stressors:

> Pt reports that she is feeling very "pissy" today for multiple reasons. She states that she has not been feeling well for some time now and has noted no changes thus far after re-initiation of effexor. She describes how she is upset that she is on a trach that she lost custody of her younger daughter, and that her younger daughter's father cheated on her with her best friend. She reports she was also taking lamictal prior to her overdose and endorses **that this is the second suicide attempt after her MVA this past year. She states she is always in pain (points to knee, back) and that no one believes her pain.**

(R. 1617) (emphasis added).

Morphine (R. 699, 1314), Percocet (R. 703, 1103, 1223, 1232, 1238, 1242, 1249, 1255, 1262, 1311), OxyContin (R. 1311), Ketamine (R. 1238) and even Fentanyl injections (R 961, 1199). Moreover, various medical providers prescribed these to Plaintiff even when they were aware of her history, which is further evidence that there was nonetheless a valid, independent medical basis for same:

> She has a prior history of drug overdose as well as drug abuse in the past. She is also apparently had suicidal attempts. **Because of this past history pain medication is very carefully prescribed to her.** This is not done by her primary care physician and she primarily gets her pain medications from her neurosurgeon that she sees Morgantown. She hasn't had a refill of the same. Doesn't want to be on pain medications and so we discussed at length about trying nonnarcotic pain medications to see the mass pain can be controlled and she is open to the idea. **She is being referred to pain specialist** as outpatient but due to insurance reasons (has WV Medicaid) hasn't been able to be seen yet.

(R. 1106) (emphasis added).

Perhaps most importantly, the undersigned notes that Plaintiff's drug use does not and cannot negate the objective medical evidence of Plaintiff's conditions or the fact that her back problems were of sufficient severity to require multiple surgeries to correct. In the undersigned's view, this issue is best framed as whether an ALJ's perception of "drug-seeking behavior" can properly support a finding of incredibility as to pain when there is a medically documented independent basis to support the allegations. Other courts in this circuit have concluded that drug-seeking behavior may be a basis for discounting a Plaintiff's claims *when* there is a lack of medical evidence to support a medical basis for those drugs. Quesenberry v. Astrue, Civil Action No. 1:06-CV-00116, 2007 WL 2965042, *3-4 (Healthcare providers declined to prescribe narcotics in light of "suspicion[n[ for over-compensatory behavior[rs given that . . . ] clinical examination and imaging studies [did not identify] the source [of or] explain the severity of his

pain.") Here, the sources of Plaintiff's alleged pain are sufficiently documented, and indisputably required more than one surgery to correct.

In addition, while Plaintiff's request for pain medication were denied on rare occasions, they were granted regularly and far more often than they were not. Of particular note, in denying Plaintiff's request for narcotic pain medicine on May 7, 2014, Dr. Daffner's explanation was based on the length of time it had been since her last surgery. (R. 1277) ("I [] explained to her that *six months postoperatively* I will not be prescribing her any narcotic pain medication."). Moreover, Dr. Daffner went on to suggest to Plaintiff that she discuss narcotic pain relievers with her primary care physician, and even put in a referral for her to the pain clinic. Id. This does not suggest to the undersigned that Dr. Daffner felt that Plaintiff was malingering or was not in pain. cf. Quesenberry at *3-4.[8] Rather, it suggests that while it was standard for him to prescribe such medications for a time after surgery, he felt that prescriptions on an ongoing or longer-than-temporary basis were more appropriately handled by someone Plaintiff would have an ongoing treatment relationship with, or who specialized in pain (or both). Moreover, both the initial and reconsideration determinations completed back in 2013 and prior also stated that while Plaintiff's statements about the intensity, persistence and functionally limiting effects of symptoms were not substantiated by the objective medical evidence alone, her statements regarding her

---

[8] "Physical examination revealed no joint swelling or redness, no weakness in his extremities, no redness or effusion to his knees, no crepitance and an upright and steady gait. This progress note indicated Quesenberry was "suspicious for over-compensatory behaviours [sic]." [as]. . . examination revealed no edema, no joint swelling or redness, no weakness in his extremities, and an upright and steady gait. He asked for Lortab (but it was not prescribed) and inquired as to "when [P]resident Bush is going to give him a raise in disability money." . . . [N]otes from March, 2003 state, "[h]is diffuse, chronic pain is difficult to explain on an organic basis. On clinical examination or imaging studies it is difficult to definitely pinpoint the source to explain the severity of his pain. This is further complicated because of significant pain behavior with non-physiological findings." He has been treated conservatively with medication and had no surgical indications. Due to his history of drug-seeking behavior, his health care providers declined to prescribe narcotics. He stated in 2003 that OxyContin was the only medication which helped his pain, but changed his story when he was informed that the drug was no longer available in the hospital. He then mentioned some benefit from Lortab and requested Lortab to no avail at another appointment in 2004."

symptoms, considering the total medical and non-medical evidence were "fully credible" and "generally consistent with objective evidence." (R. 121, 134). The evidence in the record, viewed in its totality, thus contains significant evidence that conflicts the ALJ's conclusion on this point.

To be sure, there were times that medical providers were not sure what was causing Plaintiff to be in *as much* pain as she alleged. However, her claims were generally eventually substantiated by medical evidence, and back surgery performed. Plaintiff did have a period of improvement after the first surgery, but then again had a recurrence of pain which was – again – substantiated when imaging studies showed that a second back surgery was needed to correct complications from the first. Notably, the ALJ has not cited to any medical provider who expressed a belief that Plaintiff was malingering, nor did the undersigned locate any in the record. Apparently, that is the ALJ's own conclusion, unendorsed by any medical provider. For all of these reasons, the undersigned does not think the ALJ's assumption of malingering secondary to drug use is supported by substantial evidence, particularly in light of the fact that he did not evidence consideration of same before so concluding.

Next, in limiting Plaintiff to a sedentary RFC, the ALJ stated that:

> [I]n limiting her to performing only a reduced range of "sedentary" work as above, the undersigned has nonetheless accorded significant benefit of the doubt in the claimant's favor, in view of her normal gait as recorded post-surgery by Dr. Nutter in September 2014 and her activities as reported to Psychologist Levin in August 2014. When the claimant developed discitis in late November 2014, she endorsed only a recent recurrence of significant, and then worsening pain.

(R. 21). The undersigned does not find substantial evidence for these reasons to support finding Plaintiff not credible, as explained below.

### ii.  Daily Activities

A claimant's daily activities are relevant evidence when assessing his alleged symptoms. 20 C.F.R. § 404.1529. However, "[w]e have cautioned the Social Security Administration

56

against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home." Louk v. Colvin, Civil Action No. 2:16-CV-9, 2016 WL 7383814 at *22 (N.D. W. Va. Nov. 30, 2016) (citing Craft v. Astrue's, 539 F.3d 668, (7th Cir. 2008) quotation of Mendez v. Barnhart, 439 F.3d 360, 362 (7th Cir. 2006) (emphasis added)). Moreover, "Disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations." Lewis, 858 F.3d at fn. 3.

> Here, the ALJ found Plaintiff's claims contradicted by her activities of daily living:

> However, at evaluations in August and September 2014 she was noted to do chores and housework, attend appointments, ambulate with a normal gait, and to engage in activities such as attending her daughter's school events, preparing meals and watching television.

(R. 21). In contrast, the types of daily activities that have been typically found to negate credibility include significantly more demanding activities than the ones described by Plaintiff here. See, e.g., Mastro v. Apfel, 270 F.3d 171 (4th Cir. 2001) (riding a bike, walking in the woods, and traveling to distant states without significant difficulty undermined claimant's subjective complaints of pain and fatigue); Meyer v. Astrue, 662 F.3d 700 (4th Cir. 2011) (driving, caring for horses and dogs, riding horses and operating a tractor was conflicting evidence) (remanded on other grounds for new evidence); Kearse v. Massanari, 73 Fed.Appx. 601 (4th Cir. 2003) (cutting wood, mowing grass, and occasionally shopping contradicted a disability determination). Plaintiff's daily activities here thus hardly rise to a level that would negate her credibility under our precedent, generally.

Nor is there any reason to suspect that under Plaintiff's specific circumstances, a different conclusion is warranted. Lewis, 858 F.3d at fn. 3 ("ALJ's conclusion that Lewis' activities demonstrate she is capable of work is unsupported by the record" when activities consisted of

driving short distances, shopping with assistance, handling finances, and watching television).

See also Brown v. Commissioner, 873 F.3d 251, *263 (4th Cir. 2017).[9]

### iii.  Work History

The ALJ also stated that "[t]he claimant filed both of her disability benefit applications prior to that accident and thereby demonstrated her disinclination to work and desire to receive benefits." (R. 20). However, as the ALJ also acknowledges elsewhere in his decision, Plaintiff's work history evidences numerous attempts at working various types of jobs, though not always for very long. (R. 23) (including "jobs as a bartender, administrative assistant, customer service representative, clerical worker, retail gate guard, industrial cleaner, shelter worker, home health worker and collection worker."). Moreover, the fact that she stopped working prior to her accident is not inconsistent with her claims. Plaintiff has alleged ongoing back pain for the duration of her filings. She has also acknowledged that the back pain she alleged prior to her accident was exacerbated by fractures sustained in the accident, and that medical evidence sufficient to document a disability for Social Security Purposes may not have existed prior. But none of those things contradict an assertion that she was also experiencing back pain and other symptoms before the accident. The undersigned thus fails to see no other plausible explanation for this history other than a "disinclination to work and a desire to receive benefits." An alternative plausible explanation for this work history is that her conditions made it difficult to

---

[9] In Brown, the Fourth Circuit addressed a situation very similar to Plaintiff's with regard to daily activities and likewise concluded the ALJ's analysis as to this factor did not suffice to "show[] that he could persist through an eight-hour workday:"

> With respect to the first reason for the adverse credibility finding, the ALJ noted that Brown testified to daily activities of living that included "cooking, driving, doing laundry, collecting coins, attending church and shopping." See Second ALJ Decision 11. The ALJ did not acknowledge the extent of those activities as described by Brown, e.g., that he simply prepared meals in his microwave, could drive only short distances without significant discomfort, only occasionally did laundry and looked at coins, and, by the time of the second ALJ hearing, had discontinued regular attendance at church and limited his shopping to just thirty minutes once a week. Moreover, the ALJ provided no explanation as to how those particular activities—or any of the activities depicted by Brown—showed that he could persist through an eight-hour workday.

Id. at *263. The same is true here.

sustain work, as she alleged. That, however, the ALJ seems to have dismissed without any significant consideration. See Forquer at *11 (ALJ's conclusion that claimant "has a poor work history and . . . quits jobs after a short [] time for no particular reason," when Plaintiff clearly stated that her conditions and symptoms were the reason she was not able to hold down a job, did not have substantial evidentiary support).

> **2. The ALJ improperly minimized Plaintiff's conditions by mischaracterizing or selectively cherrypicking facts to support his finding, while either missing or failing to discuss relevant conflicting evidence in the record, as well as drawing medical conclusions from the record with no clear basis.**

> ### a. Duration

Plaintiff argues that "[t]he medical records of evidence absolutely do not support the ALJ's contentions [that] 'the claimant appears to have recovered significantly from the 2013 accident well within 12 months' and that the 'discitis evidenced by the claimant in November and December 2014 is not seen to be intractable over a period of 12 months' (Tr. 47)." (ECF No. 16 at 16). Defendant argues that the "ALJ [permissibly] concluded that for the year following her surgery, the record simply did not support disabling functional limitations" because consultative examinations and treatment notes after October 2013 so indicated. (ECF No. 18 at 10). Plaintiff replies that while there was "some uncertainty in the early follow up as to the . . . pain and discomfort [Plaintiff] experience[ed] post-operatively," records from Dr. Daffner and Dr. Moorehead, coupled with the fact that Plaintiff would likely require additional surgeries in the future, support Plaintiff's claims. (ECF No. 21 at 1-2). Plaintiff also points out that the most recent medical records and imaging studies contain evidence that her infection was *not* in fact resolved. Id. at 3.

Defendant argues that following Plaintiff's first back surgery in 2013, "Dr. Daffner did 'not have any specific activity restrictions for her.'" (ECF No. 18 at 10, citing R. 1270). While

true, it is also a selective citation that – like the ALJ – ignores the totality of the record. Plaintiff

required a second back surgery, and in January 2015 Dr. Daffner articulated a list of specific

restrictions:

> Activity:
> You may walk and climb stairs as tolerated. Walking outside (in nice weather only) or
> walking on a treadmill (no incline) is also allowed. Walk as much as possible, letting
> your discomfort be your guide.
> DO NOT lift anything weighing more than 10 pounds.
> DO NOT bend or twist at the waist; always bend with your knees
> Limit your sitting to 20-30 minute intervals. You should lie down or walk around in
> between sitting periods. There are no limitations on sitting in a recliner chair.
> You may sleep in any position which makes you comfortable. It is normal to have a little
> difficulty sleeping in the first few weeks following your surgery . . .
> Driving:
> You may not drive a car until told otherwise by your surgeon.
> You may be a passenger for short distances (30-40 minutes). If you must take a longer
> trip, make several stops so that you can walk around and stretch your legs. Reclining the
> passenger seat may be more comfortable.

 (R. 1315). The overall relevance or probative value of a lack particular restrictions at a single

point in November 2014 is thus unclear, given that a few months later Plaintiff underwent a

second surgery that was accompanied by clear restrictions. Defendant's citation of Eighth Circuit

case Hutton v. Apfel, 175 F.3d 651 (8th Cir. 1999) is as unclear as it is unavailing. In Hutton, "no

doctor had placed Hutton on any physical restrictions," which is not the case here. (ECF No. 13

at 6).

Moreover, the ALJ's claim that "[w]ith treatment, including antibiotics and subsequent

hardware removal, any related pain or other symptoms are expected to resolve to a baseline level

well within 12 months, particularly with the claimant's ongoing use of pain medication for

related relief" is particularly troubling. (R. 23). The ALJ provides no citation to either medical

evidence or a medical source for this conclusion, leaving the undersigned to guess from whence

it came. Nowhere in this record was the undersigned able to locate a medical source who opined

anything of this nature as to duration, although the undersigned did locate evidence to the contrary.

Dr. Daffner also specifically noted in November 2013 before the first surgery that "the goal of the surgery is to treat her acute symptoms and stabilize her spine . . . **the surgery will likely not treat her longstanding chronic back pain and potentially could exacerbate her preexisting back pain**." (R. 917) (emphasis added). Dr. Daffner clearly articulated that he expected future surgeries would be needed. (R. 1920) (stating on May 21, 2015 that they "discussed the likelihood that [Plaintiff] will need another revision procedure extending her fusion proximally"). The ALJ's conclusion that "any related pain or other symptoms are expected to resolve" is thus particularly puzzling and directly contradicted by Plaintiff's treating orthopedic specialist. Even consultative examiner Dr. Nutter opined as to duration that Plaintiff's limitations had lasted or could be expected to last for 12 months. (R. 1032).

An ALJ may not cross "the line between considering the evidence of record and 'playing doctor' by drawing his own medical conclusions about [a Plaintiff's] . . . impairments." Forquer v. Commissioner, No. 1:15CV57, 19 (N.D. W.Va. 2015), citing Frank v. Barnhart, 326 F.3d 618, 621-22 (5th Cir. 2003) (noting that ALJ impermissibly made his own independent medical assessments by drawing his own medical conclusions from the medical evidence of record). Accord Lewis v. Berryhill, 858 F.3d 858, *869 (4th Cir. 2017) ("In light of the extensive treatment . . . the ALJ [] improperly "play[ed] doctor" in contravention of the requirements of [] 20 C.F.R. §§ 404.1529.").

### b. The ALJ clearly mischaracterized statements of Plaintiff's Counsel that were cited in support of finding Plaintiff's allegations to be incredible.

Lastly, Plaintiff argues that the ALJ "grossly mischaracterized Counsel's arguments regarding Plaintiff's disability status and utilized these mischaracterizations to further erode

Plaintiff's credibility. The ALJ stated that '[Plaintiff's] representative candidly admitted that there was little to no evidence to support the claimant's contention of longstanding disability' and that her 'co-representative has conceded that there is little evidence to support the claimant's disability as alleged since September 2012' (Tr. 44 and 47). While Counsel did discuss amending the alleged onset during her opening statement at the administrative hearing (Tr. 66-69), Counsel submitted both pre- and post-hearing memorandums in support of a finding of disability for Plaintiff, neither of which 'conceded' to a lack of evidence in support of Plaintiff's claim (Tr. 457-461). ECF No. 16 at 17.

Defendant argues that 1) it is clear the ALJ merely committed a typographical error in stating "September 2012" as Plaintiff's alleged onset date was September 2010; 2) a prior determination found Plaintiff not disabled from September 2010 through September 2012, so the time period is not at issue. ECF No. 18 at 13-14. The undersigned is convinced of neither. The ALJ clearly, obviously, and intentionally amended the date of his consideration to be "[f]rom September 6, 2012 through June 30, 2015 (R. 16, 21), as explained fully in significant detail in the ALJ's decision:

> Accordingly, the scope of further consideration will be restricted herein to a determination as to the claimant's disability status only since September 6, 2012, i.e., the day after the date upon which an unfavorable, unappealed determination was made with regard to the prior benefit application that she protectively filed on May 29, 2012. That unfavorable, September 5, 2012, initial determination is considered and herein adjudged to be binding and final with regard to the claimant's disability status as of and prior to that date.

(R. 12). The ALJ's use of "September 2012" is thus "clearly" not a typo. Second, although the ALJ stated that he adjudged the September 5, 2012 initial determination to be "binding and final," the record suggests otherwise. In a Disability Report – Field Office, an SSA interviewer noted the following as to the potential onset date recorded on Plaintiff's claim:

5. Explanation for Potential Onset Date, when applicable: NH denied after this date but was not represented and alleged a mental health issue therefore Res Judicata does not apply and [potential onset date] is [alleged onset date].

(R. 360). Nonetheless, as Plaintiff has not disputed that, what is actually at issue is the ALJ's characterization of Plaintiff's counsel's remarks. The undersigned agrees that they were improperly mischaracterized and Plaintiff obviously did not concede that there was little to no evidence to support disability either generally – at all – or after September 2012. This is not a proper basis on which to justify finding Plaintiff less credible as it does not fairly reflect what Plaintiff's representative stated.

## VII.    CONCLUSION

In summary, the undersigned emphasizes that any determination on a record this lengthy and complex is unfortunately made far more difficult by the lack of chronologically relevant medical opinions concerning physical functional limitations in the record. The limitations endorsed by agency reviewer Franyutti predate either of Plaintiff's surgeries. The limitations endorsed by Dr. Nutter occurred prior to Plaintiff's second surgery, and were during a period where objectively Plaintiff was – as she does not dispute – somewhat improved. Dr. Nutter gives no indication he reviewed any of Plaintiff's medical history or treatment notes in performing his consultative examination. Her alleged recurrence of problems and pain later in 2014 and through 2015 are not addressed by any medical source opinion as to limitations - only treatment notes.[10]

The undersigned points this out to place in context the clarification that there is a great deal of evidence here, some of which could be conflicting or weigh against Plaintiff. It is possible that valid bases for a nondisability finding could be properly articulated on this record;

---

[10] A current formal opinion and medical source statement as to limitations by Plaintiff's treating specialist, Dr. Daffner, would have been particularly helpful. In the absence of any such guidance, all are now in the unfortunate position of debating what treatment notes, hospital admission notes, and other raw data between November 2014 and June 2015 may properly mean.

however, that was not done by the ALJ here. It is also possible that if Plaintiff is found more credible upon reconsideration, the ALJ's RFC may not suffice. The undersigned expresses no view as to the ultimate conclusion, as it is not the court's role to reweigh the evidence. However, the mischaracterizations, omissions, unsupported medical conclusions, and questionable assumptions in the ALJ's decision are at odds with the Commissioner's directives and give no confidence that the record was "carefully" considered, as he is obligated to do. SSR 96-7p(3) ("[An ALJ] must **carefully** consider the individual's statements about symptoms with the rest of the relevant evidence in the case record in reaching a conclusion about the credibility of the individual's statements . . .") (emphasis added). As a result of the errors and omissions detailed in this report and recommendation, the undersigned is of the opinion that nothing less than remand for reconsideration would suffice.

## VIII.   <u>RECOMMENDATION</u>

For the reasons herein stated, I find that the Commissioner's decision denying the Plaintiff's application for Disability Insurance Benefits and Supplemental Security Income is not supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 15) be **GRANTED**, Defendant's Motion for Summary Judgment (ECF No. 17) be **DENIED**, and the decision of the Commissioner be vacated and this case be **REMANDED** pursuant to for further proceedings.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objections are made, and the basis for such objections. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge.   Failure to timely file objections to the Report and

Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Court **DIRECTS** the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia. Additionally, as this report and recommendation concludes the referral from the District Court, the Clerk is further **DIRECTED** to terminate the magistrate judge's association with this case.

Respectfully submitted this January 16, 2018.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE